REMBERT ROLLER COMPRESS CO. v. AMERICAN COTTON CO. et al

(Circuit Court of Appeals, Fifth Circuit. March 29, 1904.)

No. 1,289.

1. PATENTS—INFRINGEMENT—METHOD OF BALING COTTON.

The Rembert patent, No. 441,022, is for a method of baling cotton by which it is ginned, condensed, and baled into standard compressed bales ready for shipment in one continuous operation. The method consists in passing the cotton in a sheet after it leaves the condenser between rolls, the sheet being then folded to the proper size for a bale, and the air between the layers pressed out by an ordinary press. The theory of the patentee, as stated in his application and amendments thereto, is that, when cotton is subjected to a pressure just short of that which will injure the fiber, it for a time loses its elasticity, and the sheets will therefore remain in the same compressed condition in which they leave the rolls until they can be baled. *Held* that, in view of the prior art and the proceedings in the Patent Office, the patent must be restricted to a method which depends for its successful operation upon the utilization of such theory, there having been prior patents for mechanism for compressing cotton in layers; that, as so restricted, the method as shown by the evidence lacks utility; and that, if conceded validity, the patent is not infringed by the use of the mechanism of the Graves patent, No. 473,144, by which the cotton, after being compressed in sheets, is kept under continuous pressure until the sheet has been rolled into a bale.

Appeal from the Circuit Court of the United States for the Southern District of Texas.

A bill was filed in the Circuit Court for the Eastern District of Texas by the Rembert Roller Compress Company, a Texas corporation, against the American Cotton Company, a New Jersey corporation, having its principal office in the state and city of New York, and doing business in the Eastern District of Texas under a permit from the state of Texas, and against the Wharton Gin & Milling Company, a Texas corporation, having its place of business in the Eastern District of Texas (it being alleged that the Wharton Gin & Milling Company is the agent of the American Cotton Company, conducting in part the business of the American Cotton Company in the county and town of Wharton, in the Eastern District of Texas), and against R. H. Houston, president of the Wharton Gin & Milling Co. The purpose of the bill is to restrain the defendants from infringing letters patent No. 441,022, issued to Henry Rembert on the 18th day of November, 1890, and assigned by said Rembert to the Rembert Roller Compress Company. The patent set up in the bill is a process patent. The object of the method so patented is to gin, condense, and bale cotton in one continuous operation, and so effectually to reduce the size of the resulting bale of cotton in the first original initial process as to make it of suitable dimensions and density for market, or for transportation by rail or sea to final destination. This patent contains a description of an apparatus which the patentee says is considered "best adapted for carrying out the patented process under certain conditions mentioned in connection with the apparatus," but "it is to be distinctly understood that this apparatus is not the essence of the present invention," and that the method herein claimed may be carried into effect by various other mechanisms, which will suggest themselves to the skilled mechanic as equivalents of the one described. The precise claim of the complainant as to this process patent can be gathered from an extract from the bill, as follows:

"Heretofore the usual method of handling and baling cotton practiced in the Southern States has been as follows: The cotton fiber, when it comes from the field of production, is first passed through the gin and the condenser, and from the latter it is carried to an ordinary 'country' or 'plantation' press, where it is pressed and baled. The bales formed by these 'plantation presses,' as they are termed, are very large and bulky, and therefore require considerable space for storage, and greatly increase the cost of transportation. The bales, after being formed, are then transported to a compress located at some concentrating point, where they are subjected to a very heavy pressure, sufficient to reduce their size and increase their density to the required 'standard' fixed by the railroad companies, boards of trade, and others, after which they are ready for shipment, by rail or otherwise, to the manufacturers. This method of handling and baling the cotton had many disadvantages and drawbacks. In the first place, the usual method of handling the loose cotton in the ginnery establishment, previous to being baled, causes the atmosphere of the building to be completely filled with floating fiber finely comminuted, which dust not only stifles and interferes with the attendants, but also greatly increases the danger and risk of a conflagration, and thereby increases the cost of the fire insurance. It also necessitates the employment of a number of attendants, which materially lessens the profits of the producer. The bales, when they come from the first pressing operation, are necessarily large and bulky, and low in density, inasmuch as the ordinary plantation or country presses are not adapted for heavy pressing, and for that reason are not only difficult to handle and require a large storing space for their keeping, but also greatly increase the cost of transportation from the ginning establishment to the compress, which is often located a long distance from the ginning point; but probably the most serious drawback attendant upon the use of the foregoing manner of handling cotton is the great cost of building and maintaining the powerful hydraulic and steam compresses required for compressing the bales before they are shipped to the manufacturer, and the expense to which the producer is put in having the bales thus compressed. To reduce the bales to the standard size and density required by the trade, these presses are necessarily large

and expensive, not only in building but in maintaining them in operation, as is evident. By this invention of Henry Rembert are obviated the main difficulties in the manner of handling and baling cotton heretofore in vogue, and substitute therefor a simple and inexpensive method, that may be carried out in the ginning establishment without the employment of costly labor and powerful compresses, and by means of which the cotton is not subjected to unnecessary handling or exposure, but by a continuous process is formed into bales of a size and density that will equal the standard compressed bales. This method may be carried out and operated by means of the same power that operates the ginning mechanism, and from this fact it derives one of its chief advantages."

The bill then states the claims made by Henry Rembert in his patent, which are as follows:

"(1) The method of baling cotton, which consists in compressing the same progressively, accumulating the compressed fiber previous to its expansion in the form of a bale, applying the pressure to expel the air, and finally tying the bale, substantially as specified.

"(2) The method of baling cotton, consisting in compressing the same in the form of a continuous sheet, lapping said sheet before it has had time to expand in the form of a bale, and subsequently applying pressure to expel the air from between the layers, substantially as specified.

"(3) The method of baling cotton, which consists in condensing the same in the form of a continuous soft bat, compressing the same progressively, accumulating the compressed fiber previous to its expansion in the form of a bale, applying pressure to expel the air, and finally tying the bale, substantially as specified."

The allegations of the bill show that exactly what Henry Rembert claims to have discovered was that the elasticity, or tendency to expand, in cotton, can be suspended for an interval; that cotton can be compressed to a point just short of crushing and injuring the fiber, so that it will retain its density, when so compressed in detail, that it can be baled, and, when so baled, be a compressed bale. It is claimed that Henry Rembert found a bat of cotton which had been run over by a train on a railroad track, and discovered that, while the wheel passing over the cotton on top of the rail crushed the fiber, the flanges of the wheel compressed a part of the bat to a point just short of injuring the fiber, and then or thereafter resulted his intellectual conception of the use of the discovery, which it is said he then made. The practical use of this alleged discovery was, as shown by the extract from the bill, to compress finally at the gin, and thereby obviate the expense and trouble of making the old-fashioned plantation bale of cotton at the gin, and then transporting it to the compress, and having it there compressed, so as to be of sufficient density for commercial use for shipping by rail and by sea. The bill then alleges infringement on the part of the American Cotton Company and the Wharton Gin & Milling Company, and prays for an injunction and accounting.

There was a demurrer to the bill, which demurrer was overruled, and the bill was answered by the American Cotton Company and the Wharton Gin & Milling Company. In the answer the defendants admit the issuance of the letters patent to Henry Rembert for an alleged method of invention of baling cotton, but deny that he is the original and first inventor of the alleged method or invention as set forth in his bill. It is also admitted that the letters patent and the invention set forth therein have relation to an alleged method of baling cotton, and that said alleged method is adapted to be practiced at the point of ginning, to form a continuous process of ginning; but it is stated that defendants are not informed, save by complainant's bill, that the object of said alleged method is to gin, condense, and bale the cotton in one continuous operation, and so effectually to reduce the size of the resulting bale of cotton in this first original initial process as to make it of suitable dimensions and density for market or transportation by rail or sea to final destination, and they therefore deny the allegation in the bill in this behalf, and leave the complainant to make proof thereof. The defendants deny the alleged discovery of a "law of nature," and they deny that the elasticity of cotton can be suspended, and utmost density short of crushing

its fiber obtained in detail, before baling. They also deny that the letters patent in suit embrace the conception of a new property in cotton, by which it remains compressed, and so retains its density when compressed in detail. They also deny that, when cotton is compressed as set forth in said letters patent, it can be baled, and, when baled, is a compressed bale. They also deny that the alleged invention of Rembert obviated the main difficulties in the manner of handling and baling cotton in vogue prior to said application, and substantially they deny that by Rembert's alleged invention a simple method was discovered of baling and compressing cotton by one continuous operation at the point of ginning, thereby saving two operations, viz., the ginning and forming into a plantation bale at the gin, and then transportation to another point and compression there. The defendants in their answer then deny that Henry Rembert was the true original and first inventor of the alleged method or process of baling cotton to which the letters patent No. 441,022 relate, and on information and belief allege that, long before any invention or discovery made by Rembert, the same and substantial and material parts thereof had been invented, and had been known to and used by others in this country, and had been in public use or on sale in the United States for more than two years prior to the date of the application for said letters patent. The names and places of residence of persons who had such prior knowledge, and by whom the same was publicly used or sold, are then given. The defendants, further answering on information and belief, say that the letters patent issued to Henry Rembert are invalid and void, because the alleged invention therein set forth and claimed, or material and substantial parts thereof, had prior to any alleged invention or discovery thereof by Henry Rembert been patented and been described in printed publications in the United States and foreign countries. It then sets out a number of patents, antedating that of Henry Rembert, issued by the United States Patent Office, and two issued in Great Britain. The defendants deny any infringement on the part of the American Cotton Company or the Wharton Gin & Milling Company.

In effect, the pleadings here raise, so far as we deem it material to consider them, issues as to the patentability of Rembert's alleged discovery on the ground that the same lacks novelty and utility as to the prior art, and as to whether Rembert's patent is infringed by the process or method in use by the American Cotton Company and the Wharton Gin & Milling Company. A large amount of testimony was taken, and the case heard upon the pleadings and proof, and after consideration the court made a final decree dismissing the complainant's bill. In a brief opinion filed by the judge presiding in the Circuit Court, the following conclusions of law and fact are stated:

"Conclusions of Fact. I find, from the facts: First, that the Rembert patent, as it relates to the method of compressing cotton, is without novelty; second, that said patent is without utility; third, that the inventor of the Rembert process is not a pioneer in the art of compressing cotton; fourth, that the method patented by Rembert is without claim to priority; fifth, that the defendants the American Cotton Company and the Wharton Gin & Milling Company are not infringing upon the method or machinery covered by the patent issued to the complainant.

"Conclusions of Law. Applying the law to the facts above stated, the bill of complainant should be dismissed, which is accordingly done; the costs to be ascertained and taxed against the complainant."

George E. Mann, for appellant.

Eugene Williams, Richard N. Dyer, and Frank L. Dyer, for appellees.

Before PARDEE, Circuit Judge, and SPEER and NEWMAN, District Judges.

After stating the case as above, the opinion of the court was delivered by NEWMAN, District Judge.

The first inquiry in this case is: Did Henry Rembert make a patentable discovery and one having utility? The claim is that he discovered

that the resiliency, or tendency in cotton to expand, could, by compression to a point just short of injuring the fiber, be arrested or suspended for a sufficient length of time for it to be folded or lapped into a bale, so that the only thing left to be done would be by slight compression to expel the air from between the laps or layers, and apply the fastenings, making in this way a bale of sufficient density to be a standard commercial bale for shipment to distant points by rail or water. The density required by the various cotton exchanges is not less than 22½ pounds per cubic foot. The additional advantage claimed is that this result is obtained by one continuous operation at the point of ginning. The practicable method of utilizing this alleged discovery was by passing the cotton between two rollers, so as to form a bat to be lapped into a bale. Unless it is true that cotton will remain in this compressed condition after passing between the rollers a sufficient length of time to carry' out the remainder of the process—that is, to lap into a bale, exclude the air, and tie—there is no merit in the complainant's claim.

The file wrapper proof in this case shows that Rembert's original specifications and claims were unsatisfactory, notwithstanding amendments thereto, and were rejected by the Patent Office. The application was again amended and renewed, and was finally granted with the claims which have been set out above. The amendment to Rembert's specifications, so far as important, which finally caused the granting of the letters patent, was as follows:

"A marked distinction between my method of producing a bale of compressed cotton and those which preceded it lies in the fact that I effect the compression progressively; that is to say,' by compressing a small portion or unit of the mass at a time, and thereafter accumulating these compressed units, instead of effecting the compression of the entire mass at one operation, as heretofore practiced. The expressions 'compression' and 'compressed cotton,' as used in the present specification and claims, refer to that extreme compression, such as is effected by the so-called 'compresses' of the present day, and which, falling just short of the crushing of the individual fibers, so solidifies or condenses the mass that the elastic or expansive tendency is for the time being suspended."

There was also an amendment, in connection with the foregoing, in reference to the apparatus accompanying the application, as follows:

"While I have illustrated and described herein that form of apparatus which I consider best adapted for carrying out my process under certain conditions, it is to be distinctly understood that this apparatus is not the essence of the present invention, and that the method herein claimed may. be carried into effect by various other mechanisms, which will readily suggest themselves to the skilled mechanic as equivalents of the one herein shown and de- scribed."

In the remarks accompanying the applicant's last amendment was the following:

"It is now well recognized in the art that by compressing cotton to a point just short of crushing the fiber is'to cause it to cohere for a short space of time, so that, although relieved of pressure, it will for the time being retain its solidified and condensed condition. Applicant's results are attained by taking advantage of this fact."

So that we thus reach Rembert's precise discovery, as shown by this file wrapper proof; that is, the utilization, as he says, of a law of na-

ture, the suspension of the elasticity or tendency in cotton to expand for a brief interval after being relieved from heavy pressure.

The rejection of Rembert's original claim by the Patent Office was on several grounds. One of those was Clemens' patent, No. 7,612, September 3, 1850. The Clemens patent, which caused the first rejection of Rembert's application, will be gathered from a part of the specifications, as follows:

"Cotton and other substances above enumerated have always heretofore been packed and pressed by pressure applied by a platen or follower directly to the whole mass. This of necessity requires great power, and, if the substance or substances be matted and in uneven lumps, the whole mass cannot be well condensed. By my invention I am enabled to condense the mass into a much smaller compass, and by much less power than heretofore, while at the same time the substance or substances can be unpacked to more advantage for the purpose of manufacture, particularly when applied to cotton. The first part of my invention consists in packing the substances above enumerated and all others of a like character in a series of successive layers or strata, by the action of a roller or rollers, or cylinders, or curved or beveled faces on the surface thereof, the pressure being in succession applied to one or more of such layers or strata, whereby the substance or substances to be pressed and packed are more evenly distributed, and therefore in a condition to be condensed into a more compact mass and with less power, for the reason that the power is divided and applied by the surface of the roller or rollers or cylinders, or their equivalents, to a small portion of the surface of each layer or layers, instead of to the whole mass at once. The second part of my invention, which relates to the means for applying the first part of my invention, consists in combining with rollers or cylinders, or their equivalents for laying and compressing in successive layers or strata, a bed which shall recede from the surface of the rollers or cylinders as the layers or strata accumulate, and which either traversed back and forth under them, or over which they traverse from end to end to distribute the layers or strata. The third part of my invention consists in combining with a press for packing and pressing substances in successive layers or strata, by means of rollers or cylinders, or their equivalents, a lapping machine for laying or forming the fibrous substance or substances to be packed into a lap or laps, preparatory to the operation of laying and pressing. The fourth part of my invention consists in combining with each of the laying and compressing rollers, or their equivalents, a series of rollers, or their equivalents, for retaining the layers in their compressed state as the bed traverses under them."

Clemens' administrator, Chetlain, obtained a patent in 1876 (No. 187,-814) for an improvement in cotton presses. A brief statement from the specifications will show what his patent embraced:

"Cotton, which in a loose state is very bulky, should be compressed in small quantities in order to condense it as much as possible, and to obtain the maximum density each increment to the volume of the cotton should be compressed at the time it is added to the bale. This improved cotton press packs the cotton in this manner, and at the same time in such a way that it can afterward be used from the bale to the best advantage. The cotton, as it comes from the gin, is formed into a continuous sheet, which is pressed and laid under pressure in folds doubled one upon the other. The bale is thus formed of continuous parallel layers of cotton greatly condensed."

Rembert's patent was rejected on the further ground of the English patents to Lahaussois of November 22, 1877. The character of that patent may be gathered from a brief extract from the specifications, as follows:

"In the presses, as hitherto constructed, the entire mass required for a single bale has been placed in the press, and the whole mass compressed at one time. In such pressing the portion situated at the surface is much more

compact and dense than that near the middle of the bale. The object of this invention is to make the bale equally dense throughout; and it consists in pressing the material in successive layers, one after the other, and then combining the several layers into one bale, as more fully hereinafter described."

Taking this file wrapper proof in connection with what is otherwise shown by the record, it is manifest that Rembert's alleged discovery is confined within very narrow limits. It is the application of that quality in cotton which causes it to cohere after severe compression for a brief interval to practical purposes in compression and baling. Unless this suspended elasticity after compression to a point just short of injury to the fiber occurs, and unless this quality in cotton, if it exists, can be applied as claimed, Rembert's patent would be invalid, and his case must fail for this reason. It is contended on behalf of the defendants that, after any compression of cotton short of crushing the fiber, expansion occurs immediately, and that practical experiments with Rembert's method have demonstrated this. There is considerable evidence in the record on this subject.

William F. Ladd, who had been vice president of the Rembert Compress Company since 1893 and up to the time he testified in this case, was examined with reference to the expansion of cotton under the Rembert process after leaving the rollers. His first allusion to it is as follows:

"Q. Did you notice that the sheet, or bat, expanded after it left the compression rollers? A. Yes, sir. Q. And I suppose, while it was accumulating in the press box, and before the final pressure was applied, it also expanded? A. Yes, sir. Q. Do you recollect whether the final pressure which you applied actually compressed the layers which had accumulated in the press box? A. After the cotton passed through the rollers it expanded to twice its thickness in the press box, and by the application of pressure in the press box it was compressed back almost to the same thickness it had in passing through the rollers."

On examination in rebuttal, Mr. Ladd testified as follows on this subject:

"A. Several of the witnesses whose testimony you have asked me about say that the pressure of the baling press was to not only exclude the air from between the laps or folds of the bat that had been condensed by the rolls, but that it compressed the bats themselves. I want to explain that the fact is that when the bat had passed between the rolls it fluffed a little as it got the air into its exposed surface, and so the air between the bats was also in the surface of the bats to some extent; but there is no question in my mind that a press with a power of some 50 tons to the whole surface of the bale did not do more than squeeze out the air that there was between the layers, as this bat had just been a few minutes before subjected to a roller pressure of several thousand tons to the surface of one lap of the bale, and while the surface fluffed, the body of the bat was still compressed, so that there could be no density added by a plantation press that at the outside could not put a pressure to the whole surface of a bale of over 50 tons. The average country press, with which many first-class Rembert bales were made, is not over 30 or 40 tons. The best, such as was used with the Rembert at Palmer, and part of the time at Galveston, only gave a pressure of about 50 tons."

The testimony of Henry Rembert, the patentee, on this subject, can be gathered substantially from a few questions and answers on his cross-examination. After testifying that the cotton bat, before it entered the compression rollers, was about two inches thick, or should be about that thickness, and that as it passed immediately between the

rollers it was not thicker than a piece of brown paper, then testified as follows:

"Q. How thick was the bat after it left the compression rolls? A. I could not tell you, sir. I could not measure it. Q. If its expansion was suspended by the compression of the compression rolls, is it your view that the bat, after it left the compression rollers, was as thin as when it was subjected to the maximum compression as it was when between the rolls? A. I expect probably the body of the bat was, but there was a good deal of fuzz on each side of it, which was sticking to each roll. It would fuzz up a little, but the main body of the bat was thin. Q. Your point, then, is that the bat was compressed by the compression rolls, so as to be reduced to an extremely thin sheet, and that, after leaving the compression rollers, certain of the fibers on the surface protruded to form a fuzz, or fuzzy surface, which gave the appearance of thickness to the bat? A. No, sir; I could not say that it did. You could see it was simply a loose fuzz that was pulled up when the bat left the two rolls, and I suppose the cotton sticking to the rolls caused it to pull out a little. The main body of the bat was firm. Q. It was like a blanket, as I understand you? A. No, sir; I could not say it was. The blanket is not as firm. The fuzz stuck out like a blanket, but the main body of the bat was firm, and the blanket is not. Q. The body of your bat, after passing through the compression rollers, was firmer than the blanket? A. Yes, sir."

This embodies about the strongest testimony for the complainant as to the suspension of elasticity in cotton, after leaving the compression rollers.

T. J. Griffin, who was a machinist, and had been in the employ of the Rembert Company, testified as follows:

"Q. Were any rolls put on the folder, so as to assist in holding down the bat of cotton in the compress box? A. Yes, sir; there was an addition of three rollers placed on the machine, one of which was a wooden roll set directly over the positive compression roll, or a little past the center nearest the condenser from said compression roll, to gradually press down the mass of cotton as it passed down the chute before entering between the compression rolls. Then there were a set of rolls placed on a traveler inside of the receiving box, connected by means of rocker arms to the sides of the folder, so that the stroke of the folder going backwards and forwards to hold the mass of cotton that those rollers would come in contact with [the accumulated mass of cotton in the receiving box], and press it down, so as to obviate the necessity of punching it down with a stick. Q. Well, now, were those follower rollers intended to keep the cotton from expanding in each layer? A. Yes, sir; the intent of those rollers was to squeeze the air from under each bat as it was folded or deposited by the folder. Q. And was it also its purpose to compress and keep compressed the cotton in each layer? A. No, sir; as it would expand after passing through the rolls. Q. Well, did the cotton expand after passing through the compression rolls? Is that what you refer to? A. Yes, sir. Q. Explain just how it appeared and did as it passed before, through, and after the compression rolls. A. Before it passed through the compression rolls it was in a fluffy mass or bat, the rollers being tied together in housing, with sufficient pressure exerted on the templet screws, so as to make the negative or friction roll rotate thereby. When the rolls were properly adjusted, by dropping a piece of ordinary paper through the rolls, it would flatten, or have a tendency to flatten, and, in passing from a three to a six inch bat of cotton in its fluffy state between the rolls, it would necessarily put an enormous, incalculable pressure on the journals. After passing through the rolls and allowing it to remain in the receiving box for a few moments, or pulling it off of the bat, as we often done, as it passed through the folder, we would find the bat of cotton had expanded, with the cotton dry and fluffy, to half an inch thick. Q. How thick was it as it passed through the rollers just in the line of contact? A. That I cannot answer intelligently, as the rollers were rigidly in contact. The only elasticity or give that there could possibly be in the spring on the shaft or housings. Q. Would it be less

than a quarter of an inch? A. Yes, sir. Q. Much less? A. Yes, sir. Q. You might estimate it by saying less than one-sixteenth of an inch? A. I should say so. Q. After the cotton had gone through the compression rollers, it would expand until it was a half an inch in thickness? A. Yes, sir. Q. You say that with the cotton in its normal condition that it would expand to even more than that at times? A. Yes, sir; and, to illustrate, with damp or green cotton we could easily, without any punching or pushing down of the accumulated mass of cotton into the receiving box, make a bale of cotton weighing from 550 to 600 pounds. In cotton that was dry and fluffy, very often we could not get in the same sized receiving box a bale weighing from 400 to 450 pounds. Q. What is the normal condition of cotton—dry and fluffy, or green and wet? A. Dry and fluffy."

In reference to the experimental plant carried on at Galveston, Mr. Griffin testified as follows:

"A. There were something like between 1,000 and 1,200, I will say, of bales of cotton made on the experimental plant in Galveston. Some few bales of the cotton, I understood, were ginned for customers, and others were ginned on account of the company—cotton they had bought. My understanding, which was quite frequent, that the bales of cotton we were making did not have a sufficient density, and that I was told that I would have to apply more pressure on the ordinary press, which in every instance that I done, the result would be a broken press, and parts of the press would have to be carried off, and as often as twice and three times a day, to be repaired, and to my personal knowledge I know of a great number—how many I can't say exactly—that were carried and placed under the follower blocks of the Taylor compress and there recompressed. A great many bales, however, and a majority of the bales that we made in Galveston, were shipped away on board of cars, and I presume, not hearing anything more and not being connected with the office, that they were satisfactory. In many instances I have calculated the density of those bales, and found them, not a great many of them over the average of 22½ pounds per cubic foot, and a great many under the required density; that is, after it had passed the experimental stage, it was ginned (or we tried to gin, up to the period the cotton seed became damaged), they would be run straight along, and a great many bales would be perfect, and others would be imperfect. * * *"

G. T. Loutitt, who was employed as a mechanical draughtsman by representatives of the Rembert Company, and who had a contract to build one machine, testified on this subject as follows:

"Q. Very briefly, just explain how and where the cotton went after passing out of the condenser in the Rembert method. A. The cotton came out of the condenser in a sort of a bat, and passed between two cast-iron rolls. Underneath these rolls there was a folder, which folded the cotton in an oblong bale, you can call it—not a square bale. It folded it in a box the same size as the bale. This box was made so that it would revolve, and afterwards the cotton was put under a screw press, and in some instances a hydraulic press, and in some instances a knuckle-jointed press, so that the cotton could be brought down to what the Rembert people called a 'compressed bale.' Q. Now, in passing from the condenser to the rolls, about how thick was the bat, as you first saw it, if you can remember? A. It was about two or three inches thick—2½ inches; about that. Q. It passed into the crevice between the compression rollers, then, just before going in, at two or three inches thick? A. Yes, sir. Q. While it was between the compression rollers, how thick was it? A. That is hard to judge. I should judge about three-eighths to half an inch. Q. Were the rollers so arranged as to meet before the cotton came into it? A. Well, they were screwed up almost tight, so that the faces were almost tight together. Q. When you first saw it, were those rollers both fixed, so that there was no give to them, or was one of them arranged so that it would move back and forth? A. By loosening the screw, you could. Q. When you had tightened the screw? A. It would not give—only the spring, that is, in the iron. * * * Q. Then the only give was the give that the iron would give by reason of its flexibility?

A. Yes, sir; that is right. Q. As it passed through, then, it was in a very thin band or bat? A. Yes, sir. Q. You said about half an inch. Do you speak advisedly? Was it as much as that from your experience? A. No; not at the point of contact. No, sir; not at all. I do not think that between the rollers it was more than three-sixteenths of an inch—from one-eighth to three-sixteenths. In fact, sometimes they were almost tight up. Q. When the cotton, then, passed in, they were almost tight up? A. Yes, sir; almost tight up. Q. And the actual thickness of the bat at that point, as it passed the point of contact of the rollers, you think would be very thin? A. Yes, sir; very thin. Q. The exact thickness you could not accurately estimate? A. No sir. Q. Now, after it passed out from this crevice or point of contact, what was the actual, practical result, as you observed it? Did the cotton widen out, or did it remain thin?. A. It widened out a good deal. It expanded. Q. How much? A. I should say it would expand to an inch and a half or two inches—an inch and a half, anyhow. Q. Do you remember, by fixing in your mind the first time you ever saw the process, it being a novelty—did it fix itself in your mind? A. Yes, sir."

There is much testimony in the record as to the difference in the operation of the Rembert process with damp cotton and with dry cotton. When working with damp cotton, it would retain its compressed condition much better than when the cotton was dry and fluffy, which fact hardly needs expert testimony to demonstrate.

Benjamin Worley tried one of the plants of the Rembert Company, and the first year it was put up, after making five or six bales, and it failing to work satisfactorily, he shut it down, and the next year it was put in perfect order and again tried. As to the last experiment Mr. Worley testifies as follows:

"Q. Well, was it put in perfect order next season? A. Well, it was, yes, sir; but it did not accomplish the desired results. Q. That is what I was getting at. Did you try to run it parts of two seasons? A. Not the same plant. We did the system. Q. That is what I am speaking of, the system? A. Yes, sir; we tried to run it a part of two seasons. Q. Then, taking the first efforts that you made, you say you packed a few bales of cotton on it? A. Yes, sir. Q. Mr. Rembert came up, and you had a talk with him, and he told you to put it out, and to put back your old system? A. Yes, sir. Q. Did you do that? A. Yes, sir; he told me to throw it out, but I put back my old system on my own account. Q. He told you to put it out? A. Yes, sir; his words were: 'Throw the damn thing out. It is no good.' Q. That is what Rembert himself said? A. Yes, sir. Q. But he stated he would perfect it for the next year? A. Yes, sir. Q. And there was an effort made in that direction? A. Yes, sir; a very strong one too. Q. Now, taking up the first year, what was the cause of what you call a failure? A. Well, sir; there was only one cause. That was that the cotton would not hold the compression after it passed through the rolls. The cotton was too dry. It would expand to fully 50 per cent. of its original size or thickness. We passed a bat through there six inches thick, and it came out three. * * * Q. Now, what would it take to make the method work upon dry cotton at any time? Did any suggestion come to your mind about it? A. Yes, sir; there is only one thing that would make it work. The cotton was compressed, and, if they had just had some contrivance to have held it under compression after they had compressed it, it would have been a success. It had time to expand, you see, after leaving the rollers until it reached the box, and it expanded to 50 per cent. of its original thickness."

Mr. Worley then testified to the fact that the cotton usually retained its compressed condition better near the coast, as at Galveston, when it was damp, and, substantially, that after getting 50 miles from the coast the cotton would be too dry to retain its compressed condition by this process. Mr. Worley further testified:

"Q. When this cotton got to the box where it was to be formed into the bale, could they get enough cotton in there to make the regulation size bale? A.

They could make the regulation size, but not the weight. Q. Well, by size I mean weight. What was the trouble? A. They could not get enough cotton in there. It was too bulky. The box would not hold sufficient cotton to make the regulation weight bale. By regulation weight is meant 500 pounds. Q. Now, when you had gotten in there as much as you could get in this press box, was the mass as it then existed loose and fluffy, or were these laps in a state of thin felt bands? A. No, sir; they were loose and fluffy. Q. In making the bale and tying it, after this step was reached in the process, what result was necessary from the press in order to make a bale? A. It was necessary to put on more pressure than we could obtain from the press to make a bale. We could not get the pressure. If we wanted to make a compressed bale out of it, the press that we used was not sufficiently strong to make it. Q. Was there any other duty for the press to perform than pressing the air from between the layers? A. Well, if they wanted to make a success of it, there was. Q. What was it? A. It did not only have to press the air from the layers, but it had to still go further. It had to press the cotton close enough to make a condensed compressed bale of it; but the press did not have the power to do that."

A. D. Thomas, a witness for the defendants, who seems to have practical knowledge of the subject in question, says in his testimony:

"I do not think it possible to compress cotton in a thin sheet, so that it will not expand, without injuring the fiber."

D. H. Harkey, a witness for the defendants, testifies as to the press at Palmer, Tex.: "By the time they got the bale ginned, it was flabby and loose, and in a great pile"—and that after leaving the compression rollers the cotton expanded enough to require compression to press it again.

J. J. Payne, a witness for the defendants, testified:

"Q. When it came out from under that little crevice between the rollers, do you remember how thick the bat was there? A. I don't know. It was not half an inch thick, I would not suppose—hardly. Q. Afterwards, when it was accumulated in the press box, did it remain like it was when it passed through the rollers? A. No, sir. Q. What did it do then? A. It expanded, and that was the trouble. They could not hold it."

We think it is demonstrated by the evidence in this case that the theory upon which the Rembert patent is based is not sound. The evidence shows that, when cotton is passed between the rollers as proposed by Rembert, the elasticity or tendency in cotton ordinarily dry to expand is not suspended long enough to fold it into a compressed bale as proposed, and to make in that way a compressed bale; using the term "compressed" in its commercial and technical sense. One of the great difficulties about Rembert's alleged discovery is the fact that it requires that the cotton shall be compressed to a point just short of, but not quite to, injury to the fiber. It requires such a nice adjustment of the machinery in order to reach this point of compression, and especially with reference to the dampness or dryness of the cotton, that in practical experiments, as this evidence shows, it proved almost, if not quite, impossible to make the process a success, for this very reason. This is illustrated by a brief extract from the testimony of Mr. Worley, the witness who has been before referred to:

"Q. Did you find that the cotton at Gatesville could be compressed to a degree of compression which would destroy its elasticity, but not injure the fiber? A. No, sir; I did not. Q. Whenever you got to the point where the elasticity was destroyed, the cotton was destroyed? A. Yes, sir."

The foregoing, of course, are not all the witnesses examined pro and con, even on this particular question; but those we have referred to, and the extracts from their testimony, we think, present fairly the character of the testimony submitted by the parties respectively as to this matter. At all events, we think it is fairly established, by the evidence as to the practical experiments with this process and with the machines adapted to its use, that the fiber was injured, or, if not, that expansion immediately after compression by the rollers resulted, so as to prevent the making of a satisfactory compressed bale.

With the particular feature which has been discussed eliminated from the Rembert patent, which, indeed, is the whole invention claimed, it is unnecessary·to refer to the prior art further than we have in citing the patent by Clemens' administrator, Chetlain, and the Lahaussois British patent. The Clemens patent of 1850 was for a "method of packing and compressing substances into bales or packages in a series of successive layers or strata by means of rolling pressure or its equivalent." It combines with the laying and pressing rollers, or cylinders, "a bed which shall be gradually separated from the rollers or cylinders as the layers or strata accumulate," etc. The patent of Clemens' administrator of 1876 is to "provide a machine that will bale cotton by a continuous automatic action in direct connection with the process of ginning it." It provides for a "mechanism for forming the loose cotton as it comes from the gin into a sheet, for conveying the sheet into the baling bed, and depositing it, under pressure, in layers doubled back and forth, one upon another," etc. Lahaussois' British patent of 1877, to be used for hay, cotton, and other substances, provided for "pressing the material in successive layers, one after the other, and then combining the several layers into one bale." The pressure on the layers is by "two compression cylinders." Two patents to Samuel D. Keene, issued in 1884, No. 307,119 and No. 307,200, might also be cited in this connection as anticipating the Rembert patent, when the.latter is confined within the narrow limits we have indicated; but we deem it unnecessary to discuss further this feature of the case.

If the Rembert patent could be sustained, we are satisfied that it is not being infringed by the defendants' method and apparatus. The defendants are using, somewhat modified, the apparatus for which John W. Graves obtained a patent December 5, 1893, the application for which was filed April 22, 1890, and renewed May 5, 1893, No. 473,144. In the specifications attached to his application, after referring to the former method of baling cotton, he states his invention in this way:

"My invention consists, first, in improved mechanism for baling cotton and other fibrous materials, which consists in feeding and simultaneously subjecting the same, in the form of a bat or sheet, to friction and pressure during the baling operation, by means of a belt, within the loop or bight of which the bale is formed by continuous accretion and rotation of the fiber, and by effecting its compression in detail, or layer upon layer, as it is fed to the bale, which is preferably effected, when baling cotton by delivering the sheet or bat into the press from the condenser of a gin in an unbroken condition; second, in mechanism for causing the bat or sheet of fiber, as.it is fed into the press, to be subjected to constant friction and compression, which, never being released until the bale is finished, results in the greatest attainable density of the material, and in the layers throughout the bale constituting retaining bands for those wound interiorly thereof, which are held or bound by the layers outside; third, in mechanism which is adapted for applying the

covering or bands, when such are used, to the completed bale, without permitting the same to expand; fourth, in devices for permitting the loop or bight of the belt to automatically accommodate itself to the increasing size of the bale; fifth, in automatic tensioning devices, whereby the pull or pressure upon the belt is increased approximately in the ratio of increase of the diameter of the bale; sixth, in automatic devices for sustaining the increased size and weight of the bale in the same plane, while permitting it to move freely within the bight of the belt; and, seventh, in the special mechanisms employed for carrying out the objects or purposes of this invention, as hereinafter fully disclosed in the description, drawings, and claims."

John W. Graves, testifying in this case as to the apparatus used by the defendants, says:

"In my patent, No. 510,388, I use the endless belt, passing over a series of rollers and about a central spindle or core, and about which the bale is wound; the bale being formed by winding up convolutely a continuous sheet or bat of cotton subjected to pressure during the formation of the bale. In the apparatus now used by the American Cotton Company, a device similar in construction is used, consisting of an endless belt passing over a series of rollers and about a central core or spindle, about which the cotton is wound; the same pressure being retained until the bale is completed and tied out. The press used at present by the American Cotton Company is identically the same in principle and method as that employed by me in all my experiments. The same principle of passing the covering around the bale while under pressure and tied out is employed. The only difference of importance between the machines of my patent and that used at present by the American Cotton Company is in the manner of applying the pressure to the belt under which the bale is formed."

Magnus Swenson, manager of the operating department of the American Cotton Company, and a witness for the defendant, describes the defendant's apparatus and method as follows:

"The apparatus consists primarily of two horizontal rolls, with a core, which is held in movable check plates, and which it located between those two rolls. One of the rolls is mounted in stationary bearings, while the other roll is mounted in bearings that are allowed to slide or move away from the fixed roll. The movement of this movable roll is resisted by two hydraulic jacks located at the end of the press. The press is furnished with gearing that revolves the two baling rolls in the same direction. An endless belt, called the 'baling belt,' which is practically as wide as the baling rolls, passes over both of the baling rolls and underneath the core, and in the slack loop of the belt is located a roll which guides the belt and keeps it tight. The bat former is located directly over the press, and consists of a chamber, in the upper part of which is located a perforated drum, which revolves at a rapid rate. This drum condenses the cotton by allowing the air to pass out through the perforations in the drum, and the cotton falls down on two other perforated drums which are located in the lower part of the case or bat former. These two drums rotate slowly, and form the cotton into a loose bat or sheet. This sheet passes down between two doffer rolls, located underneath the bat-forming drums; these rolls giving the bat sufficient pressure to make it smooth and coherent. This bat passes down a chute, and the action of the press carries the bat underneath the core, whereon it is wound into a bale, owing to the pressure which is exerted by the resistance of the movable roll and belt. The cotton bat goes into the press continuously until the bale is of sufficient size, when it is covered with burlap and ejected from the press; the core being removed after the bale has been taken out."

As will be perceived from the foregoing, there is nothing whatever in the machine or method used by the defendants which infringes in the least upon the precise process or method for which Henry Rembert obtained the patent in suit in this case. There is no attempt in

any part of the operation of the defendant's machine or process by which the suspension of elasticity in cotton is utilized in any way in forming the bale, or the bat of which the bale is made. In another part of the testimony of Mr. Swenson, the following questions and answers will show that this is true.

"Q. You state that with the apparatus originally used by the Cotton Ginners' Compress Company, as well as with the apparatus now used by the American Cotton Company and its licensees, the cotton sheet or bat is caused to pass between a pair of doffer rollers, which slightly compress it. Can you form an opinion as to the relative density of the sheet or bat after it leaves the batting or doffer rollers, as compared with the available density of the sheet or bat after it is wound in position on the finished bale? A. The bat is compressed when it goes. through the doffer rolls to about an inch in thickness. This immediately swells out until it is about four inches in thickness, and this bat is condensed in the press to about a fourth of one inch in thickness. From which it is readily seen that the pressing of the cotton is practically all accomplished in the press, as the pressure which it receives between the doffer rolls has practically nothing whatever to do with the density of the bale. Q. I understand from this that with the apparatus of the American Cotton Company a very much greater density is secured in the baling press than is secured by the operation of the batting or doffer rollers. Is this correct? A. That is correct, as the pressure which the bat receives between the doffer rolls is only for the purpose of making it adhere and for smoothening it, and has nothing to do with the density which it gets in the press."

The compression of the bale by the defendants' method and apparatus is obtained by winding up a bat in cylindrical form. Each convolution adds pressure to that already wound, and ultimately makes the required density in the bale. Each layer, as the bale is continuously wound, keeps the layer underneath in its compressed condition. In Graves' specifications practically what is done by the defendants is described in this way:

"To effect the compression or baling of the fiber, by winding the bat smoothly or without tangling or twisting its fibers, around a removable core or shell, so that the pressure upon the fiber will constitute the main retaining element or holding means for the completed bale, and so that any light wrapping or covering which will arrest the expansion of the outer layer of the bat, will also prevent all expansion of the rest of said bale; also, the fiber will be left in such condition that, when said covering has been removed, the rotation of said bale can be reversed, and the bat unwound in a continuous or unbroken sheet, but in a more compressed condition than when it was originally delivered from the condenser."

· For the purpose of determining whether the defendants' apparatus and method infringes the Rembert process, we think Rembert patent should be confined within the limits heretofore stated. It will not be extended beyond the language of the patent, and its history in the Patent Office. Giving it a very liberal construction, it must still be viewed in the light of the language of the patent, and the file wrapper evidence. In Shepard v. Carrigan, 116 U. S. 593, 6 Sup. Ct. 493, 29 L. Ed. 723, the rule on this subject is stated in this way:

"This fact, and the file wrapper and contents, of which we have stated the substance, make it clear that the claim and specification of the Macdonald patent must be construed to include, as their language requires, a fluted or plaited band or border as one of the essential elements of the invention. Without this element the patent would not have been issued. The Patent Office decided that without it the invention had been anticipated. Where an applicant for a patent to cover a new combination is compelled

by the rejection of his application by the Patent Office to narrow his claim by the introduction of a new element, he cannot, after the issue of the patent, broaden his claim by dropping the element which he was compelled to include in order to secure his patent. Leggett v. Avery, 101 U. S. 256, 25 L. Ed. 865; Goodyear Dental Vulcanite Co. v. Davis, 102 U. S. 222, 228, 26 L. Ed. 149; Fay v. Cordesman, 109 U. S. 408, 3 Sup. Ct. 236, 27 L. Ed. 979; Mahn v. Harwood, 112 U. S. 354, 359, 5 Sup. Ct. 174, 6 Sup. Ct. 451, 28 L. Ed. 665; Cartridge Co. v. Cartridge Co., 112 U. S. 624, 644, 5 Sup. Ct. 475, 28 L. Ed. 828; Sargent v. Hall Safe & Lock Co., 114 U. S. 63, 5 Sup. Ct. 1021, 29 L. Ed. 67."

In Sutter v. Robinson, 119 U. S. 530, 7 Sup. Ct. 376, 30 L. Ed. 492, it is said on this question:

"A comparison of the patent as granted with the application very conclusively establishes the limits within which the patentee's claims must be confined. He is not at liberty now to insist upon a construction of his patent which will include what he was expressly required to abandon and disavow as a condition of the grant. Shepard v. Carrigan, 116 U. S. 593, 6 Sup. Ct. 493, 29 L. Ed. 723, and cases there cited."

In Corbin Cabinet Lock Co. v. Eagle Lock Co., 150 U. S. 38, 14 Sup. Ct. 28, 37 L. Ed. 989, there is this statement:

"Having originally sought broader claims, which were rejected, and having acquiesced in such rejection, and having withdrawn such claims and substituted therefor this narrower claim, describing a particular or specific lock, as such, neither the patentee nor his assignees can be allowed, under the authorities, to insist upon such construction of the allowed claim as would cover what had been previously rejected."

There is nothing whatever in the defendants' apparatus or method which infringes in any way, as we see it, upon the Rembert process or method of utilizing the alleged temporary suspension of elasticity in cotton for the purpose of forming a compressed bale. The defendants do not pretend by their machine to suspend the elasticity in the cotton as or after it passes through the rollers and before baling; but the elasticity or expansion is afterwards reduced and confined by the process of forming into a cylindrical bale, as has been described. In this view of the case, it is unnecessary for us to notice the contention between the parties as to the priority of conception or of use by Graves and Rembert of their respective inventions. We think the method and machine used by the defendants so easily distinguished from the Rembert process, and any machinery by which it might be utilized, as to render the consideration of their claims as to priority in time of discovery and use unnecessary.

Our conclusions are:

First. That the Rembert patent, No. 441,022, confined, as it must be, within the limits we have suggested, lacks utility.

Second. That, if it could be given a broader scope than that of utilizing the alleged suspended elasticity in cotton for the purpose of forming a compressed bale, it was anticipated in the prior art.

Third. Confining complainant's alleged invention within the limits we have herein suggested, it is not in any way infringed by the defendants' apparatus and method of baling and compressing.

We think, for these reasons, that the decree of the Circuit Court dismissing complainant's bill was right, and it is affirmed.