**GREAT LAKES CARBON CORPORATION**

v.

**CONTINENTAL OIL COMPANY, Lake Charles Chemical Corporation**

and

**Union Carbide Corporation.**

**Civ. A. No. 6946.**

United States District Court
W. D. Louisiana,
Lake Charles Division.

June 21, 1963.

See also 23 F.R.D. 33.

purchasers of petroleum coke. It was in the business of buying and selling petroleum coke for many years before entering into the business of manufacturing graphite electrodes for the steel industry in about 1940. It was Great Lakes' activities in the manufacture of such electrodes which eventually led to its application for the patent here in suit and to the events which plaintiff contends gave rise to its causes of action. Defendants are Union Carbide Corporation, Continental Oil Company, and Lake Charles Chemical Corporation. Union Carbide Corporation is a very large publicly held corporation engaged primarily in the manufacture of chemicals and related products. A division of Union Carbide (National Carbon) has been engaged in the manufacturing and selling of graphite electrodes for use by the steel industry since 1928.

Continental Oil Company is a large petroleum refining and marketing company. It has refineries in a a number of locations at which crude oil is fractionated and refined into a multiplicity of products. One of the products—actually a more or less unwanted by-product—of Continental's refining operations is ordinary petroleum coke. Continental has conducted a coking operation at its Ponca City refinery since the 1920s. A coking unit was built and went on stream at its Lake Charles, Louisiana refinery on or about January 1, 1958. Defendant, Lake Charles Chemical Corporation, is a wholly owned subsidiary of Continental Oil and its acts are the acts of Continental.

Continental sells all of the coke produced at its Ponca City refinery to Great Lakes Corporation. Great Lakes has been getting all of that coke since at least 1947 and continues to do so.

Continental sells all of the coke produced at its Lake Charles refinery to National Carbon and has done so since the coking unit was built in 1958.

Continental produces two grades of coke in each of its coking units. One of the grades of coke produced in each refinery is called either Regular or No. 2 coke. The production of regular coke is

Earl Babcock, Duncan, Okl., Burns, Doane, Benedict, Swecker & Mathis, Washington, D. C., Carl Peters, Morton Grove, Ill., Plauche & Plauche, Lake Charles, La., for plaintiff.

Wolfe, Hubbard, Voit & Osann, Chicago, Ill., L. David Trapnell, Ponca City, Okl., John L. Hohmann, New York City, Liskow & Lewis, Lake Charles, La., for defendants.

HUNTER, Judge.

Plaintiff, Great Lakes Carbon Corporation, hereinafter called Great Lakes, is a very substantial, privately held corporation which is one of the world's leading

not involved in this litigation. Produced in each refinery also is a second grade of coke called variously "No. 1," "special," "needle," or "premium" coke.

It is the manufacture of this "special" coke at the Lake Charles Refinery which brings about this law suit. Plaintiff claims with respect thereto that the process used at the location infringes its patent (SHEA—2,775,549) and that its alleged trade secrets have been "stolen" by defendants in connection therewith.

Plaintiff does not contend that any apparatus (or "machine", as the statutes call it) is new. The claims of SHEA are directed to a process for making "needle coke" from the residues of more common crude oil.

■ Prior to the 1952 Patent Act, the statutes provided that any person who invented a new "art, machine, manufacture, or composition of matter," could obtain a patent. The 1952 Patent Act changed the word "art" to "process," and gave this definition to the word "process":

"(b) The term 'process' means process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material."

35 U.S.Code, § 100.

Thus, the 1952 Act gave a new meaning to the word "process" in patent law. Rohm & Haas v. Roberts Chemicals, 245 F.2d 693, 4th Cir. The 1952 Act became effective January 1, 1953, but it applies to all patents, whether applied for before or after the effective date. Southern Saw Service v. Pittsburgh-Erie Saw Corp., 239 F.2d 339, 5th Cir.

SHEA does not purport to cover needle coke per se. What plaintiff contends is that SHEA teaches a change which enabled the use of recognized equipment for the specific purpose of making needle coke [1] out of asphalt base crude oils. The process consists of two steps. The first involves the preparation of a coking charge stock, and the second consists of coking that charged stock. The coking charge used in the accused process consists principally of thermal tar. There is nothing new about coking thermal tar to produce needle coke. This was done years before SHEA's invention by Kendall Refining Company at Bradford, Pennsylvania. Plaintiff asserts, however, that the process used by Kendall in preparing the thermal tar does not anticipate SHEA because the reduced crude used by Kendall was a paraffin base crude and did not contain "contaminants" which interfere with the formation of the needle structure, and hence could not have been removed therefrom as taught by SHEA. However, it is conceded that thermal tar is a residuum that was produced at Continental's Lake Charles Refinery from asphalt base crude oils (by a process that plaintiff claims as step (1) of its invention) for years before a coking unit was even considered for that refinery and is attributable in no way to Great Lakes or SHEA (plaintiff's answer to defendants' Interrogatory 26 on December 6, 1958). In fact, all agree that step (1) [isolated] is standard refinery procedure, but Great Lakes asserts in essence that SHEA taught that this tar, when coked under certain conditions in a delayed coker, makes "needle coke."

Defendants deny each and every allegation of wrongdoing. As to the SHEA patent, defendants assert that it is neither valid nor infringed, and outline the various defenses urged on the patent phase of this case in the simple chart which follows:

I. The words "needle coke" are used interchangeably with "premium coke," "special coke" and "No. 1 coke."

DEFENSES TO CHARGE THAT DELAYED COKING OF BLEND OF 80% PRESSURE TAR AND SYN-TOWER
BOTTOMS WITH 20% DIRTY RESIDUA INFRINGES ONE OR MORE CLAIMS OF SHEA PATENT

Referring to this chart, defense counsel argues, "If you take a pair of scissors and think of these little boxes as on a string and if you find that we are right on what we say in a single box on either side, and clip it off, they [Great Lakes] have lost on the patent side of this case."

At the time of the trial, over seventy (70) runs had been made at Continental's refinery at Lake Charles making this "special" coke. Each run lasts about ten days and several thousand tons of coke are made during each run. The charge of infringement is based on what was done at Run 10 in October of 1958. Both plaintiff and defendants had their experts and attorneys present during Run 10, and many samples of feed stocks and coke were taken and tested by both sides during that run.

The system used for performing the process in making needle coke during Run 10 is shown on Exhibit PX–52. It is essentially the same system as that used by Continental to make needle coke for Great Lakes in Ponca City, Oklahoma since 1953, except that instead of using only the clean (Tank 68) residuum to make needle coke (as is done at Ponca City), Continental blends in twenty (20) per cent of dirty residuum from Tank 90 when making needle coke at Lake Charles.

Plaintiff has urged that Claims 1, 2, 9, 10 and 11 of SHEA are infringed by the accused process. The five claims are:

"1. A process for producing needle-like coke which comprises removing from a high boiling petroleum residuum those components which readily. form an insoluble phase upon heating at 350°–550°C., and coking the remaining residuum in a quiescent pool."

"2. The process of Claim 1 further characterized in that the insoluble phase is removed by a step comprising distilling about 80 to 90% of said residuum and coking the overhead in a quiescent pool."

"9. A process for producing needle-like coke which comprises removing from a high boiling petroleum residuum those components which readily form an insoluble phase upon heating at about 350° to about 550°C., coking the resulting material in a coking operation comprising the steps of first heating a stream of the material to a coking temperature, then continuously passing it into a coking zone, maintaining a liquid body thereof in said zone at a coking temperature and converting it to coke, said material being heated and coked without agitation except that incident to the natural movement of the material and of vapors in said steps, and at a rate and under conditions of thermal homogeneity precluding sharp temperature gradients within the material during said heating and coking which would cause localized premature coking of minor portions of said material with resultant contamination of the body of material prior to its solidification, and recovering a coke of needle-like structure."

"10. The process of claim 9 wherein the components which readily form said insoluble phase are removed by forming a charging stock for catalytic cracking, subjecting said charging stock to catalytic cracking conditions of temperature and pressure, separating gas, gasoline, recycle stock and a high boiling aromatic residue, and coking said residue under the defined conditions."

"11. The process of Claim 9 wherein the components which readily form said insoluble phase are removed by forming a charging stock for catalytic cracking, subjecting said charging stock to catalytic cracking conditions of temperature and pressure, separating gas, gasoline and recycle stock, subjecting said recycle stock to thermal cracking to produce gas, gasoline, gas oil and a high boiling aromatic resi-

due and coking said residue under the defined conditions."

## HAS PLAINTIFF PROVED THAT SHEA WAS INFRINGED LITERALLY OR UNDER THE DOCTRINE OF EQUIVALENTS?

In determining whether an accused device or composition infringes a valid patent, resort should be had in the first instance to the words of the claim. If the accused device falls clearly within the claim, infringement is made out, and that is the end of it. Plaintiff vigorously insists that the accused process reads on SHEA and that any other conclusion would constitute semantic hairsplitting.

Here, since coking processes of various kinds, including some which afforded "needle-like" coke were known before SHEA, it is apparent that plaintiff's claims cannot be construed—quite apart from the details of the accused process—as validly covering coking operations, generally, or even all coking processes which afford so-called "needle-like" coke. Clearly, plaintiff received a grant to a particular coking process. Here, the claims were finally granted after more than seven years prosecution.

Claim (1), as well as the others, it is asserted are literally infringed. That claim reads:

"The process of producing needle-like coke which comprises:

"(a) removing from a high boiling petroleum residuum those components which readily form an insoluble phase upon heating at 350°C.–550°C., and

"(b) coking the remaining residuum

"(c) in a quiescent pool."

Claim 1 is identical with all other claims in the patent in the respect that it requires the removal of insolubles from a petroleum residuum and the coking of the resulting, insoluble-free residuum.

Certain propositions of law will necessarily affect the Court's determination of the issue of infringement. They are:

(1) The claims of the patent are the measure of the grant. Universal Oil Products Co. v. Globe Oil & Refinery Corporation, 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944); Godfrey L. Cabot, Inc. v. Huber Corp., 127 F.2d 805 (5th Cir., 1942).

(2) A claim is not infringed if one of its elements is omitted without substitution of an equivalent. Del Francia v. Stanthony Corp., 278 F.2d 745 (9th Cir., 1960).

(3) There *can* be infringement under the doctrine of equivalents even though there is no literal reading on the accused process. Graver Tank Company v. Linde Air Production Company, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Hunt Tool Company v. Lawrence, 242 F. 2d 347 (5th Cir., 1959).

(4) A range of equivalents will not be accorded a claim, under the doctrine of equivalents, which would give to that claim the scope of one sought and denied during the prosecution, where the alleged infringement is in an area to which the prior art could possibly have been thought to extend. Smith v. Magic City Kennell Club, Inc., 282 U.S. 784, 789, 51 S.Ct. 291, 75 L.Ed. 707; I. T. S. Rubber Company v. Essex Rubber Company, 272 U.S. 429, 47 S.Ct. 136, 71 L.Ed. 335; International Harvester Co. v. Kellefer Mfg. Co., 67 F.2d 54 (9th Cir., 1933); Hunt Tool Co. v. Lawrence, 242 F.2d 347 (5th Cir., 1957); Air Devices, Inc. v. Air Factors, Inc., 210 F.2d 481 (10th Cir., 1954).

(5) The range of equivalents cannot be extended to cover processes disclosed in the prior art. International Harvester Co. v. Kellefer Mfg. Co., 67 F.2d 54 (9th Cir., 1933); Air Devices, Inc. v. Air Factors, Inc., 210 F.2d 481 (10th Cir. 1954).

## WAS THERE LITERAL INFRINGEMENT?

The Flow Chart, PX–52, is agreed upon by all parties and all witnesses as accurately representing the apparatus for carrying out the accused

process. All witnesses agree that the crude oil entering the refinery, through the crude oil still, contains dirty components; and all agree also that after being distilled there was obtained a clean stock which is free from "those components which readily form an insoluble phase upon heating at 350°–550°C." However, we cannot construe the claim language to literally mean that the step of "removing" insolubles from a residuum occurs when clean, insoluble-free gas oil is distilled from the dirty residua in the tar separator and in the vacuum jug. It is also apparent to us that when plaintiff insists that the "remaining residuum" is coked that plaintiff is referring not to what is left of the residua which entered the tar separator and vacuum jug (from which insolubles were not removed) but to an entirely new residuum—that is, the cracked tar which never contained any insolubles and never had any insolubles removed from it.

We conclude that plaintiff has failed to establish literal infringement because the accused process did not include the step of "removing from a high boiling petroleum residuum those components which readily form an insoluble phase upon heating at 350°–550°C., and coking the remaining residuum." The testimony of Mr. Nofsinger is clearly to that effect. So is the testimony of Mr. Ratliff. Great Lakes' Vice-President (Mr. Muller) makes this admission on cross-examination (see the Court's comment, Tr. 2131–2132).

### WAS THERE INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS?

Certainly there can be infringement, even though there is no literal reading of the claims on the accused process. Graver Tank Company v. Linde Air Production Company, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Hunt Tool Company v. Lawrence, 242 F.2d 347, 5th Cir. (1957); Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279 (1881). The Statute here categorically so provides:

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, *and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.* July 19, 1952, c. 950, § 1, 66 Stat. 798." Title 35 U.S.C.A. § 112; see also Bryan v. Sid Richardson, Inc., 254 F.2d at 191 (5th Cir., 1958); see also "Commentary on the New Patent Act," by P. J. Federico, Examiner-in-Chief, U. S. Patent Office, appearing at pages 1–70 in the first volume of Title 35 of U.S.C.A., published in 1954.

■ Mindful of Statute and of jurisprudence that an inventor, with respect to his patent, is entitled to a range of equivalents, commensurate with the scope of his invention,[2] we examine the record to ascertain whether the two steps defined in SHEA can be construed to cover what actually occurred during Run 10 at Lake Charles.

■ In making this determination we appreciate that the real test of equivalence is whether the alleged infringing process functions in substantially the same manner and under the same physical laws to produce the same result as that of the patented process. During Run 10, the crude oil entering the refinery, through the crude oil still, contained the dirty or interfering components which prevent the reduced crude oil, per se, from producing needle coke. When this crude oil was distilled, a clean stock was obtained which was free from "those components which readily form an insoluble phase upon heating at 350°–550°C." The syntower bottoms and the thermal tar were produced from the clean stream, and the material in the

2. Southern Saw Service, Inc. v. Pittsburgh-Erie Saw Corp., 239 F.2d 339, 5th Cir. (1957); Up-Right, Inc. v. Safeway Products, Inc., 5th Cir., 315 F.2d 23.

coke drum did not contain enough of the contaminating materials to prevent formation of the needles. It is clear that since the materials going into the coker were derived from the dirty reduced crude oil, somewhere between the crude oil still and the coker, the dirty or interfering components, as defined in SHEA, were removed, eliminated, disposed of, isolated, taken away, or in some fashion prevented from getting into the coker in an amount sufficient to interfere with or prevent the desired result. On the basis of what has heretofore been said in this paragraph, and on the basis of the specifications under Claims 2, 10 and 11, we find that the removal step of the accused process functions in substantially the same manner and under the same physical laws to produce the same result as that of the SHEA process. Likewise, the doctrine of equivalents applies to the coking steps in the claims. The claims say either that the coking is carried out in a "quiescent pool," or that the material is "coked without agitation, except that incident to the natural movement of the material vapors." The specification explains that this can be done either in "batch coking" or by coking "continuously" in coking drums into which hot residuum is charged (Specification, Col. 1, lines 22–27).

We now direct our attention to the countervailing equitable doctrine of file wrapper estoppel. Defendants' argument is that if SHEA is shown to have sought and then cancelled a claim during the prosecution which accords with the construction that plaintiff seeks to place on any of the claims which it did get, it will be held estopped to do so because of its file wrapper record. There are two aspects of the file wrapper estoppel defense:

(A) That plaintiff's Vice-President took oath before the Patent Office that SHEA's invention did not include coking of less than 100% "clean stock". The use of the 80–20% blend does not infringe.

(B) That SHEA cannot be construed to cover coking 100% pressure tar or syntower bottoms because of the cancellation of Claims 14–16 of the Parent Application, and Claim 9 of the continuation in part.

Before reviewing the record, let us summarize the law. The question of the effect of claim cancellation, amendment and argument has been before the Court of Appeals of this Circuit on numerous occasions. Rembert Roller Compress Co. v. American Cotton Co., et al., 129 F. 355 (5th Cir., 1904); Gerrity et al. v. Dallas Foundry, 4 F.2d 655 (5th Cir., 1925); Dry Hand Mop Co., Inc. v. Squeez-Ezy Mop Co., Inc., 17 F.2d 465 (5th Cir., 1927); Aleograph Company v. Electrical Research Products, Inc., (5th Cir., 1932), 55 F.2d 106; Godfrey L. Cabot, Inc., et al. v. Huber Corp., 127 F.2d 805 (5th Cir., 1942); Rosaire v. Baroid Sales Division, National Lead Company, 5th Cir., 218 F.2d 72; Jeoffroy Mfg., Inc. v. Graham, 219 F.2d 511 (5th Cir., 1955); Glikin v. Smith, 269 F.2d 641 (5th Cir., 1959); Hunt Tool Co. v. Lawrence, 242 F.2d 347 (5th Cir., 1957). It is clear from its decisions, as well as those of the Supreme Court and other courts of appeal that the patentee's actions before the Patent Office must be considered very carefully. They have an important bearing on the construction of patent claims and on the issues of equivalence and estoppel.

The Fifth Circuit's decision (Judge Tuttle), in Hunt Tool Co. v. Lawrence, supra, is specifically significant:

"* * * appellants are protected by file wrapper estoppel only if they can show that their alleged infringement is in an area to which the prior art could possibly have been thought to extend so as to make it impossible to make valid claims there, for there is no reason to presume that applicant made a disclaimer broader than necessary to yield to the actual challenge to his claim. See New York Scaffolding Co. v. Whitney, 8 Cir.,

224 F. 452, 462, certiorari denied, 239 U.S. 640, 36 S.Ct. 161, 60 L.Ed. 482."

### (A) THE USE OF 80–20% BLEND

Mr. Hackley, Continental's patent counsel, was employed by Continental in October of 1956. This is just before the SHEA patent issued in December, 1956. Continental has been making needle coke for plaintiff for several years at Ponca City, Oklahoma and was using 100% thermal tar (Hackley deposition, pp. 42–43).

By the time Mr. Hackley arrived on the scene, Continental had already entered into a contract with Union Carbide to make needle coke at Lake Charles. The contract was executed in January, 1956, but a meeting of the minds had substantially been reached in the summer of 1955 (Johnson deposition, pp. 36, 37). When Mr. Hackley investigated what process was proposed for use at Lake Charles, in the Spring of 1957, he was advised that defendants intended to use 100% thermal tar there, just the same as 100% thermal tar was used at Ponca City. When Mr. Hackley examined the file wrappers of the two SHEA applications, he suggested to his clients that plaintiff, in its affidavits and arguments before the Patent Office, had taken the position that anything less than 100% "clean" stock might not be included in the SHEA process. Experiments were then performed to ascertain if the presence of a certain percentage of dirty stock would "do any harm." No harm was found if the percentage was kept as low as 20%. Mr. Hackley then told Mr. Osborn (of Continental) that this process—that is, the blend—would constitute legally making needle coke by a "route entirely different from that suggested in the SHEA patent" (Osborn deposition, p. 15). Defendants then proceeded to make needle coke in Lake Charles by feeding to the coker a blend. The feed stock to the Lake Charles coker during Run 10 comprised about 20% of materials [3] which are "dirty" by the terms of the SHEA patent (cf. Col. 5) and which if coked alone will not produce needle coke (P.X.–52–53). The balance of the feed stock was derived from Tank 68 which comprised pressure tar, together with some syntower bottoms.

Defendants assert with vigor that the plaintiff, in order to obtain the patent from the Patent Office, has heretofore expressly averred that coking such a blend was not the Shea invention. Its position is that because of representations to the Patent Office, made in face of repeated rejection on the Voorhees patent, plaintiff is now estopped to argue that the claims of the patent cover coking of a charge comprising more than 10% by volume of what the Martin affidavit called "normal feed coke," i. e., reduced crude or other virgin residua, and that since the feed to the coker at Lake Charles during Run 10 was slightly greater than 20%, it is beyond the range which they say Martin swore would ever give satisfactory coke.

It does appear to us that plaintiff, during the prosecution of its patent, took the position that SHEA distinguished from Voorhees, because Voorhees involved coking a blend of "clean" and "dirty" stocks, and SHEA was limited to a 100% "clean" charge. In support of such position plaintiff assured the Patent Office that

"* * * Voorhees * * * stock is a 'dirty' one. This is true even if the cycle stock from the catalytic cracking operation is diverted in whole or in part to the pyrolytic cracking operation (line) because *this will result merely in a blend* of 'clean' and 'dirty' stocks." (p. 33 of DX–3.) (Emphasis supplied.)

At the same time plaintiff's Vice-President S. W. Martin described (Martin affidavit) the work at Pan-Am wherein various blends of "dirty" and "clean" stocks were coked before coking the 100% "clean" stock, and flatly averred:

"* * * Several experimental runs were made in which gradually increasing percentages (from 10 to

3. Duosol Extract, vacuum jug bottoms, reduced crude.

50% by volume) were blended with the normal feedstock. The coking operation was satisfactory in all respects but the coke was not suitable for the manufacture of premium large size graphite electrodes because of the 'poisoning' effect of the thermally unstable components present in the normal feed stock to the coker.

\* \* \* \* \* \*

"Following the above described preliminary tests, affiant persuaded the engineers at the El Dorado refinery to increase the amount of the special feed stock (i. e., the pressure tar) to a point where the feed consisted of 90% by volume special feed stock and 10% by volume of normal coker feed. \* \* \* *For the first time*, the resulting coke approximated the quality desired for the manufacture of large premium electrodes although the coke was not quite as good as that which had been produced from 100% feed of special feed stock in the Research Laboratory of Great Lakes Carbon by the present applicant and his associates."

"Affiant further states that following the operation in which a 90-10 blend was fed to the coker, a full scale run was made in which the special feed stock was fed to the coker *without the blending* of other materials. *This operation*, together with the preliminary thermal history of the feed stock, *is the invention* covered by Claim 9 of the Shea application." (DX–3, pp. 42–44.) (Emphasis supplied.)

Following this affidavit, the Patent Office withdrew the rejection based on Voorhees and, after requiring new claims containing the removal step and reference to the quiescent coking condition, allowed what are now claims 9, 10 and 11 of the SHEA patent.

▮ The Supreme Court, as well as the courts within the Fifth and other circuits, have consistently refused to permit a patent applicant who has taken a position before the Patent Office (expressed in the file wrapper), in order to secure the allowance of a claim, to change his earlier position after his patent has issued in order to apply the doctrine of equivalents. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942); Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132 (1940); Houston Engineers, Inc. v. Bowen-Itco, Inc. et al., 310 F.2d 522, (5th Cir., 1962); Jeoffroy Mfg. Inc. v. Graham, 219 F.2d 511 (5th Cir., 1955); Southern States Equipment Corporation v. USCO Power Equipment Corporation et al., 209 F.2d 111 (5th Cir., 1953); Stewart-Warner Corporation v. Lone Star Gas Company et al., 195 F.2d 645 (5th Cir., 1952); Aleograph Company v. Electrical Research Products, Inc., 55 F.2d 106 (5th Cir., 1932); Rembert Roller Compress Co. v. American Cotton Co., et al., 129 F. 355 (5th Cir., 1904); Quinn et al. v. Reed Unit-Fans, Inc., 211 F.Supp. 491, (E.D.La.1962); Kinnear-Weed Corporation v. Humble Oil & Refining Company, 150 F.Supp. 143 (E.D.Tex.1956); Merry Mfg. Co. v. Burns Tool Co., 206 F.Supp. 53, (N.D.Ga., 1962).

*(B) CAN SHEA BE CONSTRUED TO COVER COKING OF 100% PRESSURE TAR OR SYNTOWER BOTTOMS IN VIEW OF THE CANCELLATION OF CLAIMS 14–16 OF THE PARENT APPLICATION AND CLAIM 9 OF THE CONTINUATION IN PART?*

SHEA tried without success over a period of about seven years to obtain allowance of at least one claim which did not define the process in terms of that first positive step of removing insolubles from a residuum.

In the parent application SHEA filed original Claim 14 for the production of needle coke from the high boiling aromatic residuum derived from catalytic cracking, that is, "syntower bottoms"

(cf. p. 24 of parent application; P.X.–2). Claim 14 reads as follows:

"14. A process for producing needle type coke which comprises forming a charging stock for catalytic cracking, subjecting the charging stock to catalytic cracking conditions of temperature and pressure in a continuous operation, separating gas, gasoline, recycle stock and a high boiling aromatic residue, recycling the recycle stock to the catalytic cracking step, subjecting the aromatic residue to coking in a quiescent pool, and recovering the coke formed."

This claim was rejected by the Patent Office, appealed to the Board of Appeals, withdrawn from appeal, and finally cancelled. Claim 16, added by later amendment, was also directed to coking syntower bottoms, and was likewise rejected, appealed and cancelled.

A year after the first application was filed, an additional claim directed to the coking of pressure tar was made (P. 28 of PX–2):

"15. A process for producing needle-like coke which comprises forming a charging stock for catalytic cracking, catalytically cracking said stock, separating gas, gasoline, and a higher boiling fraction, thermally cracking said higher boiling fraction to produce gas, gasoline and a heavy residuum and coking said residuum in a quiescent pool."

This Claim (like Claims 14 and 16) was rejected, appealed, withdrawn from appeal, and cancelled. Promptly after cancellation of these claims, notice of allowance of several other claims were granted. Each of the allowed claims, however, required as the first positive step, the removal of insolubles from a petroleum residuum.

For a period of about seven months after the cancellation of Claims 14–16, there was no claim in the parent application to coking either syntower bottoms or pressure tar.[4]

The second SHEA application was filed with eleven claims. The first eight called specifically for (1) a step of removing, etc., and (2) coking in a quiescent pool. These accorded exactly with the eight claims allowed in the parent application. Claim 9, however, read as follows:

"9. A process for producing needle-like coke which comprises coking in a homogeneous condition and substantially free from thermal gradients a refractory, thermally stable petroleum residuum having an A.P.I. gravity between –2.0 and 5.0, said residuum having been formed by distilling a virgin crude oil which readily forms an insoluble phase upon heating to a temperature between $350°–550°C.$, separating a gas oil fraction from the distillate, catalytically cracking said gas oil at a temperature between $400°$ to $500°C.$, separating gas, gasoline and a high boiling fraction, and thermally cracking the latter to produce gas, gasoline and said refractory, thermally stable residuum whereby said residuum is rendered thermally stable and substantially free from components which readily form an insoluble phase upon heating to a temperature between $350°–550°C.$"

Claim 9 reveals another attempt to claim the coking of pressure tar without including the removal step and without reference to the "quiescent pool." The Patent Office rejected Claim 9 in two successive actions. Finally, after two interviews with the Examiner, Shea's attorneys cancelled Claim 9 (along with Claims 10 and 11, which were dependent thereon) and introduced what now ap-

4. Of course, such terms never appeared in the claims of the application or the patent. Those cracked tars were usually referred to in the claims as the "high boiling aromatic residue" from either thermal or catalytic cracking. "Decanted oil" or "cat. cracker bottoms" are accepted synonyms for syntower bottoms. "Thermal tar" means the same as "pressure tar."

pear as Claims 9–11 of the patent, each of which includes the specific limitation of "removing from a high boiling petroleum residuum those components which readily form an insoluble phase upon heating."

Thus, SHEA's efforts to get a claim which called categorically for producing "pressure tar" or "syntower bottoms" in a way refiners have always done so followed by coking the same was rejected. Only when the claims were amended to include the positive removal step were they allowed. Such limitations cannot be disregarded.[5]

 A patent owner is bound by the representations made by the applicant to the Patent Office during the prosecution of the patent as to the nature of his invention and the scope of his claims, where such representations were relied on by the Patent Office in granting the patent, and is estopped from asserting a broader or more liberal interpretation of the claims than the interpretation which the applicant gave to those same claims during the prosecution of the patent. This is specially true where the alleged infringement is, *as here*, in an area to which the prior art could possibly have been thought to extend so as to make it impossible to make valid claims therefor. We conclude further that Dr. Martin's affidavit, considered together with the arguments which accompanied the same, were effective in part at least to persuade the Patent Office to withdraw its rejection on Voorhees, and for that reason, too, plaintiff is estopped from asserting that its claim patent be construed to cover the accused process which involved coking of a blend of about 80% clean and about 20% dirty stock.

## VALIDITY

If SHEA is construed to encompass only such processes as removing insolubles from a residuum followed by coking the residuum which had been freed therefrom, it is clearly valid; but if SHEA is to be construed to be infringed by the accused process, it (SHEA) is invalid.

The statutory grounds for invalidity pleaded by defendants stem from 35 U.S.C.A. § 282, and in turn primarily from 35 U.S.C.A. §§ 101, 102, 103 and 112.

Of import here and in connection with the trade secret phase of this case are the histories of National Carbon, Great Lakes, Pan-Am, Gulf Cleves, and Kendall, as those histories relate to the subject matter of this litigation. These will be discussed later.

 A defense against a suit for infringement is a showing of a lack of novelty. Lack of novelty is shown by evidence as to the "prior art." The prior art is of three classes: Prior patents, prior printed publications, and prior public use. An alleged infringer who assails the validity of a patent bears a heavy burden of persuasion and fails unless his evidence has more than a dubious preponderance (Radio Corporation v. Radio Engineering Lab, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163).

 Plaintiff, in effect, is urging that its claims are to be construed to cover these two processes which occurred during Run 10:

(1) *Delayed coking of syntower bottoms* Distilling gas oil from a crude oil, catalytically cracking the gas oil to produce gas, gasoline, recycle stock and a high boiling aromatic residuum and coking the high boiling aromatic residuum in a delayed coker.

(2) *Delayed coking of pressure tar* Distilling gas oil from crude oil, catalytically cracking the gas oil to produce gas, gasoline, recycle stock and a high boiling aromatic residuum, thermally cracking the recycle stock to produce gas, gasoline, recycle

5. Mackay Radio & Telegraph Co. v. R. C. A., 306 U.S. 86, 59 S.Ct. 427, 83 L. Ed. 506 (1939); Schriber-Schroth v. Cleveland Trust Co. et al., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132 (1940); Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136, 62 S.Ct. 513, 86 L. Ed. 736 (1942).

stock and a high boiling aromatic residuum and coking the high boiling aromatic residuum in a delayed coker.

Defendants assert that if SHEA is construed to cover these processes, SHEA is invalid: (a) because of the prior patents and other publications which, long before SHEA, disclosed such process; (b) because of the public use of Pan-Am Southern's delayed coking plant to produce thousands of tons of what plaintiff designated needle coke from pressure tar by precisely the process described; and (c) because of the public use and prior invention by Kendall and Gulf, where there was produced what plaintiff recognized to be needle coke by coking pressure tar many years before SHEA.

## THE INVALIDATING PRIOR PATENTS AND OTHER PUBLICATIONS

Under 35 U.S.C.A. §§ 102 and 282, a defense of invalidity of a patent is established if:

"* * * (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * *."

All the patents and publications placed in evidence were published more than one year prior to SHEA's earliest filing date. Defendants introduced fourteen (14) patents [6] and six (6) publications (DX–48). Only one patent (Lord No. 1,966,-801) and one publication (Oil and Gas Journal of March 21, 1935, page 35, describing the Kendall process) made any reference to the quality of the coke produced in accordance therewith.

## DAY, ET AL., PATENT NO. 2,325,233

This patent, DX–12, was applied for in 1940 and was granted in 1943, some six years before SHEA's original application. It is a patent owned by Universal Oil Products, the company by which Charles L. Thomas (witness for the plaintiff here) was employed as a Chemist for many years prior to joining Great Lakes in about 1946.

This patent was not cited by the Patent Office and is entitled to considerable weight. It describes in the specification and shows in its drawing a process of distilling gas oil from crude, catalytically cracking gas oil to produce gas, gasoline recycle, and a high boiling aromatic residue, and coking the residue (syntower bottoms) by heating the same in a tube furnace to 900° F. and introducing the same into a coke drum to produce "substantially dry coke." The DAY patent specifically refers to the material coked as the "aromatic hydrocarbon" and as a heavy liquid residue. Following is the DAY Patent drawing on which there is superimposed pertinent sections from the specification which describe the flow diagram.

Dr. Thomas was asked about the DAY patent and stated that the only thing that might keep the DAY process from yielding needle coke was that it would have to be:

"* * * operated under conditions of considerable agitation in the coke drum itself."

## STRAKA PATENT NO. 2,281,338

This, too, is a Universal Oil Company patent. It was applied for in 1939 and granted in 1942 while Dr. Thomas was employed as a Chemist for that company. Like DAY, it is a patent which the Patent Office did not cite. It discloses a process of coking pressure tar resulting from the

6. DX–12, DX–34, DX–35.

(2) The heated vapors leaving coil 6 are directed through line 8 containing valve 9 into catalytic reactor 10 containing catalytic material capable of effecting the desired conversion reaction.

(p.2,col.1, ll.23-26)

(3) The conversion products leaving reactor 10 by way of line 11 containing valve 12 are preferably quenched by commingling therewith any one of several hydrocarbon oil fractions separated in the manner to be described to cool the conversion products to a temperature at which the subsequent separation into light and heavy fractions may be accomplished which may range, for example, from 650 to 750° F. The mixture of cooling oil and conversion product in line 11 is supplied to vapor separating chamber 13 which may be operated at a pressure of substantially the same order as that existing at the outlet of reactor 10. (p.2,col.2, ll.3-16)

(1) Referring to the drawing, charging stock comprising, for example, a hydrocarbon oil amenable to catalytic cracking, such as, for example, naphtha, kerosene, light and heavy gas oils or any mixture thereof is supplied through line 1 containing valve 2 to pump 3. Pump 3 discharges through line 4 containing valve 5 into heating coil 6 which receives heat from furnace 7.

(p.2,col.1, ll.5-12)

(4) The heavy fraction separated in chamber 13, including both the insufficiently converted hydrocarbons and the cooling oil, is removed from the lower portion thereof by way of line 19 and directed through valve 20 to pump 21. Pump 21 discharges through line 22

(p.2,col.2, ll.62-67)

(6) The heated oil leaving coil 26 is directed through line 28 containing valve 29 into coke chamber 30 wherein residual liquid hydrocarbons, including those supplied to and those formed in the pyrolytic treatment, are reduced to substantially dry coke. If desired, the heated heavy fraction in line 28 may be directed through line 31 containing valve 32 into the lower portion of chamber 30

(p.3,col.1, ll.15-23)

(5) The residual portion or all of the heavy fraction in line 22 is directed through valve 25 into heating coil 26 which receives heat from furnace 27. The heavy fraction in passing through coil 26 is raised to a temperature at which the desired conversion reaction is accomplished which may range, for example, from 800 to 1000° F., preferably while being maintained under a superatmospheric pressure of the order of 50 to 500 pounds per square inch.

(p.3,col.5, ll.5-14)

July 27. 1943. R. B. DAY ET AL 2,325,233

HYDROCARBON CONVERSION

Filed Aug. 26, 1940

INVENTORS

ROLAND B. DAY
ELMER R. KANHOFER

00061

thermal cracking of catalytic cycle stock which in turn was produced by catalytic cracking gas oil distilled from crude.

A drawing of the STRAKA patent with excerpts from the specification is reproduced below.

(1) Referring to the flow diagram, charging stock, preferably comprising a crude oil or a similar wide boiling range hydrocarbon material, is introduced through line 1 to separation zone 2.

(p. 1, col. 2, ll. 48-52)

(2) Separation zone 2 may comprise a fractionating zone wherein the hydrocarbon of subjected to fractional distillation to separate a light gasoline fraction containing the normally gaseous hydrocarbons, a heavy gasoline fraction, a light gas-oil fraction, a heavy gas-oil fraction and a reduced crude fraction.

(p. 1, col. 2, ll. 52-58)

(3) The heavy gas-oil fraction from zone 2 is directed through line 11 to the catalytic cracking system 12, wherein it is subjected to catalytic cracking treatment while in the vapor state. The heavy straight-run gas-oil fraction may also contain, if so desired, the light straight-run gas-oil fraction instead of separately recovering the latter through line 5; or a portion or all of the light straight-run gas-oil fraction may be directed, if so desired, from line 5 through the optional line 6 and commingled in line 11 with the distillate oil fractions supplied to the catalytic cracking system 12.

(p. 2, col. 1, ll. 20-32)

(4) In any case, zone 14 will normally include a fractionating zone wherein the vaporous conversion products are subjected to fractionation to separate the components of gasoline and lower boiling range from the components of higher boiling characteristics, the latter being condensed in the fractionating zone as a recycle fraction.

(p. 2, col. 2, ll. 2-9)

(5) The preferred form of treatment in system 20 consists in thermally cracking the recycle gas-oil fraction in a heating coil and communicating reaction chamber and reforming the heavy gasoline fraction in a separate heating coil.

(p. 2, col. 2, ll. 55-60)

(6) The conversion products obtained in the thermal cracking and reforming system are directed through one or more lines 21 to separation zone 22.

(p. 3, col. 1, ll. 19-22)

(7) The cracked residuum fraction, in the case here illustrated, is removed from separation zone 22 by way of line 23 and recovered as a product of the process. The cracked residuum fraction, however, may, when desired, be subjected to further treatment, such as, for example, to coking treatment or to solvent extraction.

(p. 3, col. 1, ll. 34-41)

## THOMAS PATENT NO. 2,294,584

This, again, is a Universal Oil Products patent and the patentee is the plaintiff's witness, Thomas. This patent, too, was not cited against the SHEA applications. It discloses coking the high boiling residue from catalytic cracking of a gas oil.

## LORD PATENT NO. 1,966,801

Here we have a 1934 patent, not cited by the Patent Office, which discloses and claims the coking of a blend of (1) pressure tar, from the thermal cracking of gas oil, and (2) reduced crude, to produce: "a commercially more valuable coke." (Page 1, Col. 1, Line 41). Claims 1 and 6 of this patent defines processes which plaintiff in effect urges the Court to hold are within the SHEA claims:

"1. The method of producing petroleum coke which comprises forming a mixture of residual tar formed by the cracking distillation of petroleum oil and residuum formed by the simple distillation of crude petroleum oil, and maintaining said mixture of said tar and said residuum at coking temperature until it is substantially reduced to coke."

"6. In coking operations in which petroleum stocks which have not been subjected to severe cracking treatment but which contain foreign solids are reduced by distillation to substantially dry coke, the improvement which comprises supplying another stock containing pitch constituents produced by severe cracking to the coking operation together with the petroleum stock containing foreign solids to be reduced to coke, and reducing the mixture to a substantially dry coke-like residue by distilling vaporizable oil components therefrom."

## THE REMAINING PATENT REFERENCE IN DX–35

The remaining patents are cumulative of DAY, STRAKA, THOMAS and

LORD, and are no more pertinent than they, and little is to be gained by a discussion of them at this point (Mr. Nofsinger's testimony relative these patents appears in the transcript on pages 2908–2938, and pages 3031–3035).

## CONCLUSION AS TO PRIOR PATENTS

Taken together, these prior patents might well have been thought to constitute anticipation of the delayed coking of pressure tar and/or syntower bottoms to produce a commercially more valuable coke; but it is important that none mentioned needle, premium or graphite electrode coke. It is significant, too, that neither Union Carbide nor Great Lakes went to these patents when they were faced with the problem of getting more needle coke.[7] Defendants, relying on General Electric v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43 insist that one cannot obtain a valid patent on a process known to others by dint of recognizing a new use for the earlier process. However, the coking steps in those prior patents were incidental to what was there disclosed and were directed to the production of more or less unwanted by-products. These patents emanated from the petroleum industry to whom coking was an everyday affair and did not deal with the problem of providing an adequate amount of premium coke for large graphite electrodes for the steel industry. We conclude that the many prior art patents cited by defendants do not anticipate the delayed coking of pressure tar and/or syntower bottoms to make premium or needle coke.

## THE PRIOR PUBLIC USES AT PAN-AM SOUTHERN, KENDALL, AND GULF

As a preface to a review of the evidence concerning public use, we direct our attention to the law involving "prior public use" as a defense under 35 U.S.C.A. § 102(b). The statutory term has been given an extraordinarily broad meaning. In Egbert v. Lippman [8]

7. They did go to Kendall and Gulf.

8. 104 U.S. 333, 26 L.Ed. 755 (1881).

the Supreme Court found public use where the inventor had given a novel corset stay to a lady friend. Thus, the fact that there is but one user, or the invention is given without profit, or that it is hidden from the general public's eye is not controlling. It is accurate to state that "public use" exists when any utilization of the invention is made by one other than the inventor where the user is under no limitation, restriction or obligation of secrecy to the inventor (Randolph v. Allis-Chalmers Manufacturing Co.).[9] The Courts have engrafted onto the statute an exception to the effect that public use does not bar a patent where that use was incidental to experiment.

Judge Burger, speaking for the United States Court of Appeals for the District of Columbia, has explained the extremely broad construction of "public use" and the judicial exception read into seemingly absolute statutory words:[10]

"[5] In order to understand the reason for the extremely broad construction of 'public use,' and the judicial exception read into seemingly absolute statutory words, it is necessary to examine the policy involved. The cases seem to be hospitable to the inventor *during the experimental stage* of his invention, but become disposed to construe the law against him thereafter. The judicial policy underlying this rule has been said to be that an inventor acquires an undue advantage over the public by delaying to take out a patent, inasmuch as he thereby preserves the monopoly to himself for a longer period than the law allows. Of course, the inventor may, if he chooses, keep the invention secret unto himself, rather than apply for a patent, but he does so at his peril. After reduction to practice, unreasonable delay in applying for a patent may be construed to be an abandonment with the consequence that the public is entitled to rights in the invention. Whether construed to be an abandonment or not, the inventor by his delay assumes the risk that he may be forestalled by a subsequent inventor. Any sale of his invention may well bar the inventor. And, as we have already seen under the stern rules laid down by the courts any public use whatever *after* the experimental period has ended will bar patentability." (Emphasis supplied.)

## THE ALLEGED PUBLIC USE OF THE "SHEA PROCESS" AT PAN-AM FROM 1951 TO 1953

All agree that the Pan-Am process was the SHEA process of coking pressure tar by first catalytically cracking a gas oil, thermally cracking the catalytic recycle gas oil, and then coking the pressure tar obtained from this latter operation.

Two questions remain: (1) Is SHEA entitled to the benefit of the June, 1949, filing date? (2) Has plaintiff established that the process at Pan-Am was not public in the statutory sense, either because it was experimental or restricted in such a manner as to preclude "public use?"

Of course, if SHEA is entitled to benefit of the June, 1949 filing date, then and in that case the operation at Pan-Am was not conducted one year prior to the filing date, so we must resolve whether or not SHEA is held to the January 25, 1954 filing date of the continuation-in-part application. A reading of the two SHEA file wrappers (PX–2 and PX–3) and the engrossed specifications (DX–16) leaves us with the opinion that SHEA did not disclose either delayed coking or pressure tar as a charge stock in the 1949 application. It was for the very purpose of adding such disclosures that the continuation-in-part was filed. By designating the second SHEA application, a continuation-in-part, plaintiff conceded that there was subject matter therein which was not contained in the first application, and

9. 264 F.2d 533, 7 C.A. (1959).

10. Watson v. Allen, 103 U.S.App.D.C. 5, 254 F.2d 342 (1957).

488

that as to the new matter the filing date of January 25, 1954 was the date against which all prior art should be measured (Tr. 2453). Thus, any public use more than one year before that filing date is effective to invalidate any claim to the subject matter added in the second application.

Having concluded that a prior "public use" existed as a result of the Pan-Am use of the process more than one year prior to January 25, 1953 (one year prior to the filing date of the continuation-in-part) the issue quickly narrows: Has plaintiff established that the Pan-Am use was not public in the statutory sense? This is a close question.

 The record reveals that the process conducted by Pan-Am, in 1952 and 1953, in which pressure tar was fed to the delayed coker, produced thousands of tons of needle coke which Great Lakes purchased from Pan-Am. Great Lakes paid Pan-Am more than $30.00 per ton— a total of more than $250,000 for this coke and then converted it into graphite electrodes which were sold to the steel industry. This coke was produced at plaintiff's behest by Pan-Am at its refinery in El Dorado, Arkansas. The production started out as a cooperative experimental project with plaintiff, having the right to determine whether Pan-Am's facilities could produce premium coke in sufficient quantities. The first of Pan-Am pressure tar coking runs (June 18, 1951) was, without doubt, experimental. So was the second (June 19, 1951). So was the third (September 12, 1951). Two additional experimental runs were made in November and December of 1951. Then, at the end of 1951, with five (5) runs now behind them and a total of approximately 2,300 tons of coke produced, a formal Great Lakes report was prepared entitled "Research Program and Budget Proposal for 1952 and Review of Program for 1951." The report stated in part:

"In the fiscal year of 1951, the following specific goals were achieved which we feel worthy of mentioning in this summary and these are:

\* \* \* \* \* \*

"3. The demonstration that a premium coke grade coke can be made in a delayed coker.

\* \* \* \* \* \*

"\* \* \* *we have definitely demonstrated that a premium type coke can be made in a delayed coker on a commercial scale. This is a major obstacle that has been hurdled.* \* \* \*" (Emphasis added.)

On October 17, 1952 the Electrode Division of Great Lakes, in accordance with usual company operation, placed an order with its Carbon Division for 17,000 tons of Pan-Am coke to be made during 1953. The purchase order was prepared on November 16, 1952 and mailed to Pan-Am on December 2, 1952. In the purchase contracts issued by Great Lakes before this one the coke had been designated as "Experimental Coke". The cover letter from Vice-President Dowdle of Great Lakes to Pan-Am reads in pertinent part:

"Please find enclosed our purchase order for 17,000 tons of Special Petroleum Coke for the year 1953. As you know, we shall take this from either El Dorado or Destrehan, or from both, leaving that to you people as to the most convenient way of handling it."

The Pan-Am witnesses, particularly Mr. Wheeler, stated repeatedly that the process at Pan-Am was experimental well into 1953. Considering the total circumstances here, we find that the operations at Pan-Am through January 25, 1953 were substantially for purposes of experiment. The experiments resulted in changes which made practical commercial operations possible. Besides, Great Lakes reserved control over the operations at Pan-Am and to some extent at least expected Pan-Am not to divulge the information concerning the pressure tar operation (PX–14). It was at Pan-Am's plant and not in Great Lakes' laboratory that plaintiff learned that delayed coking (a completely conventional—in fact, probably the most conventional method in refinery use) was just fine for making

"needle coke." They found out, too, that this could be done with 100% pressure tar without damage to the coker.

### THE PRIOR PUBLIC USES AT KENDALL AND GULF

Both of these companies coked pressure tar from the cracking of a gas oil. Both produced what plaintiff calls needle coke. However, Plaintiff distinguishes its operation from the operations of Kendall and Gulf on the basis that the Kendall and Gulf cokes originated from what it characterizes as a Category I clean crude oil, and that the Great Lakes coke originated from a Category II, or dirty, crude oil. Plaintiff concedes that SHEA does not cover the delayed coking of pressure tar when the original crude is in Category I, but that it does cover the delayed coking of pressure tar when the original crude is from Category II. This is true, plaintiff says, because when you start off with Category I, there is no removal step because there is nothing to remove, but that when you start off with Category II there is a removal step.

Neither the accused process, the SHEA process, nor the Kendall and Gulf processes are processes which conform literally to the SHEA claim language. None of them include a step of removing insolubles from a residuum, nor that of coking the residuum from which they were removed. Only if, as plaintiff urges, a process involving the distillation of a gas oil followed by cracking to produce a synthetic tar—which is then coked —was to be construed as coming within the claims, are the prior public uses relevant. Plaintiff does so contend and thus we discuss the Kendall and Gulf prior "public uses." In this connection, it is important to remember that a gas oil, when distilled in the normal way from crude or reduced crude, is always a clean stock. This is true whether it is derived from what plaintiff calls a Category I crude oil, or from what plaintiff calls a Category II crude oil. This is an important fact because the presence or absence of insolubles in the crude or reduced crude from which it is distilled is

irrelevant to the issue of whether a prior process—which involves such step followed by cracking to produce the cracked tar which is coked—is a "public use."

The records of Kendall, Gulf, Great Lakes and Union Carbide all reveal that both Kendall and Gulf made "needle coke" by coking certain petroleum residua well over a year before SHEA is alleged to have made any invention. Plaintiff's records also establish that its personnel were aware that Kendall coked a pressure tar and thereby made needle coke.

The burden of establishing the nature of the coking operation which Kendall conducted at Bradford falls upon defendants. The positive evidence as to what Kendall fed to its coker falls into four categories, viz.:

(1) The testimony of Richard W. Gray, Assistant Superintendent of Kendall Refinery who testified (deposition re-produced in trial transcript pp. 3426–3497) as to the operation of the Kendall coking process from his own knowledge during the period 1944–1955 and as compared with the operation before that time as reflected in printed publications.

(2) The printed publications relative to Kendall's operation dated in the 1934–1936 period which appear in the record as part of DX–48 (items 3, 4 and 6).

(3) The internal memoranda, reports and correspondence of Great Lakes Carbon, (DX–365)

(4) The January 1947 Downes report of National Carbon (PX–85). In this connection the Court also has the testimony of Dr. Perry, plaintiff's rebuttal witness who acknowledged (Tr. 3390–3392) that the flow diagram of the Kendall process appearing on page 36 of the Downes report shows the coking charge was the cracked resid-

uum, usually called pressure tar resulting from thermal cracking (Tr. 3391–3392).

The record from these sources establishes that Kendall coked the cracked residual tar (pressure tar from the thermal cracking of gas oils). This means that they cracked the gas oil and coked the pressure tar produced in the cracking step, leaving the reduced crude behind.

There is no competent evidence that Kendall produced coke at any time from reduced crude or whole crude. It is true that there were statements appearing in the Hackley patent and in the Downes wrapper suggesting this fact, but it was shown during trial that the statement in the Hackley patent was the result of misinformation (Tr. 2528–2529) received by Hackley from Peters (in the SHEA patent) and repeated without checking. The reference to reduced crudes on page 177 of PX–85 was an error on Mr. Downes' part and contrary to the evidence elicited from all other sources.

Documents from plaintiff's own files [11] demonstrate that Juel, Thomas and others had accurate knowledge as to the coking processes at Kendall.

We find that reduced crude from Pennsylvania oil was the source of Kendall's lubricating oil; Kendall did not coke its reduced crude but coked instead a pressure tar. It was because Kendall coked such pressure tar that it got good coke— not because, as plaintiff urges, it coked reduced crude or because its crude was clean. It is conceded, however, that this was not well known in the industry when Union Carbide and Great Lakes first set about solving their problems. Great Lakes and Union Carbide, knowing that Pennsylvania crude was generally considered in a class by itself, concluded initially that there was some connection dependent upon the type of crude oil you started with, but this was known to be false by Great Lakes at least by 1951

(Great Lakes Report No. 75, DX–215, page 3):

"1. The type of hydrocarbon is not the controlling factor since Bradford coke and Resin C, outstandingly aliphatic [paraffinic] and aromatic hydrocarbon types respectively, both yield outstanding needle type cokes."

GULF CLEVES UNIT 622 COKED PRESSURE STILL TAR FROM GAS OIL CRACKING OF OKLAHOMA CRUDE

Mr. Petrick, the Manager of Engineering at Gulf Oil Corporation, Cleves, Ohio plant, testified on deposition (Tr. 3501–3590) that he had been at that refinery from 1937 to 1956. He described the operation of the two coking units (621 and 622) and testified that the 622 unit from time to time over the period he had charge of it coked pressure tar made exclusively from the cracking of gas oil (Tr. 3533), derived from Oklahoma, a typical Mid-Continent crude oil. Plaintiff concedes that Cleves may have had this Oklahoma crude at its plant but says that there is no positive proof that the needle coke at Gulf was made from such crude oil. We feel that the evidence is to the contrary, but it is true that when Union Carbide and Great Lakes first started their search for new sources of needle coke that they did not realize that Gulf Cleves coke turned out to be a premium coke. It appears to us that the evidence is overwhelming that the Oklahoma crude was used to start with. We find on DX–35 and DX–322 (the Gulf Refinery daily run charts) that print reference is made to "Oklahoma crude." In addition to the testimony of Mr. Petrick, other sources reveal how Gulf made its coke:

1. DX–325—a publication appearing in the September, 1940 edition of "World Petroleum" relating to the Gulf Cleves coking

---

11. cf. DX–1, in the bibliography at p. 15 of this January 1, 1947 report entitled "A Study of the Formation of Needles in

Coked Materials." Item 1 is the first 1935 paper on the Kendall process included in DX–48.

operation which according to Mr. Petrick (Tr. 3538) discloses on page 72 the coking of pressure tar in 622 unit just as was shown in DX–316–318.

2. PX–85 (the Downes report) page 44 discloses that Downes and, therefore, National Carbon knew in 1947 that Gulf produced coke from the pressure tar from gas oil cracking.

3. DX–367—The excerpts from both Great Lakes and National Carbon documents, e. g.: DX–292, 293, 296, 298; DX–4, and and DX–5.

Both plaintiff and defendant recognized the excellence of Cleves' coke, and of pressure tar coke in particular (DX–367, 295 and 4).

We conclude that the record is replete that Gulf was using Oklahoma crude, which Dr. Perry admitted (Tr. 3417) was a typical Mid-Continent crude and which SHEA states is the very kind of crude which requires treatment in accordance with SHEA—that is, it contains the insolubles. Moreover, Mr. Downes' specific comparison of pressure tar and reduced crude cokes from Gulf in 1943 established the pressure tar coke to be a full 5 CTE points lower (DX–291–303). National Carbon's coke orders from Gulf following such discovery immediately thereafter expressly requested coke made from pressure still tar (DX–324–327, 330). In summary, Gulf unquestionably made pressure tar from an Oklahoma crude and coked it in a delayed coker well over a year before SHEA's original filing date. Both National Carbon and Great Lakes knew this. This process, therefore, clearly constitutes a prior public use under 35 U.S.C.A. § 102(b), which invalidates any claim of the SHEA patent that might be construed to cover the delayed coking of pressure tar to make needle coke.

## FINDINGS OF FACT

1. There are two kinds of coke made from petroleum. One is called No. 2 or regular coke and the other is called No. 1 or special, or premium, or needle, or needle-like coke. These two kinds of coke differ in appearance. Calcined particles of regular coke are dull grey in color and are round in appearance. Calcined particles of No. 1 (needle) coke have a splintery structure and a high gloss or sheen. The two kinds of coke also differ in their properties. No. 2 (Regular coke) is not suitable for use in making large graphite electrodes for use in electrical furnaces. Needle coke (No. 1) is suitable for such use, primarily because of its lower coefficient of thermal expansion (called CTE). No. 1 (needle) coke commands a much higher price than No. 2 (regular) coke.

2. The plaintiff, Great Lakes Carbon Corporation, is the owner of the entire right, title and interest in the United States patent to Frederick L. Shea, Jr., No. 2,775,549 granted December 25, 1956. This patent is on a certain process for making needle coke from petroleum hydrocarbons. Claims 1, 2, 9, 10 and 11 of the patent are asserted to be infringed.

3. From 1953 to date, Continental, at its refinery in Ponca City, Oklahoma, has made large quantities (Many thousands of tons a year) of needle coke for Great Lakes.

4. The defendants, Continental Oil Company and its subsidiary, Lake Charles Chemical Corporation (hereinafter jointly called "Continental") have a refinery near Lake Charles, Louisiana, and since January, 1958, have been making needle coke from petroleum hydrocarbons by a process (hereinafter called "the accused process") which is alleged by plaintiff to infringe the SHEA patent.

5. The defendant, Union Carbide Corporation or its subsidiary, National Carbon Company, concerted with and actively induced Continental to manufacture No. 1 (needle) coke from petroleum hydrocarbons at Lake Charles, using the process.

6. Each of the SHEA patent claims defines "A process for producing needle-

like coke" in which the first required step is that of:

"＊ ＊ ＊ removing from a high boiling petroleum residuum those components which readily form an insoluble phase upon heating at 250°–550°C. ＊ ＊ ＊"

7. A "petroleum residuum" is defined by the Glossary of Terms of the American Petroleum Institute as follows:

"Heavy oil left in the still after gasoline and other distillate have been distilled off, or residue from crude oil after distilling all but the heaviest components."

A "distillate" is a material obtained by condensing the vapors taken overhead during a distillation.

8. The defendant Continental conducts a patroleum coking operation in its Lake Charles, Louisiana refinery. Two grades of coke—called No. 1 (needle) and No. 2 (regular) coke, respectively, herein—are produced alternatively in that coking operation. All coke produced in that coking operation is sold to defendant Union Carbide's National Carbon Company division.

9. The coking operation conducted by defendant Continental is what is commonly referred to as a "delayed coking" operation. The delayed coker, as these installations are usually called, at Lake Charles is typical of those in use for many years prior to the alleged invention by SHEA.

10. Plaintiff accuses defendant Continental of conducting a process which infringes the indicated claim only at those times when Continental is producing what it calls No. 1 (needle) coke. Plaintiff does not contend that its claims are infringed when No. 2 (regular) coke is being produced. During both No. 1 and No. 2 coking operations, however, the operating conditions of the delayed coker are essentially identical and the same equipment is used. The sole significant difference between the two operations, based on the record before this court, lies in the type of residuum being charged to the delayed coker.

11. The issue of infringement has been tried on the basis of only one "run" or operation of the Continental delayed coker when producing No. 1 (needle) coke, viz., that identified as Run No. 10 which took place in October, 1958. The accused process, however, has been conducted upon numerous occasions from January, 1958 to date. The delayed coker is an integral part of the Continental refinery and is used both to produce No. 1 and No. 2 coke from various petroleum residua. The production of No. 1 or No. 2 coke is carried out as desired by opening and closing the appropriate valves in the pipe lines leading from the storage tanks containing the respective residua.

12. Plaintiff was granted permission for a number of its engineers and lawyers to be in the Continental plant during Run No. 10. Plaintiff took many samples on a twenty-four hour basis during this entire run which extended for ten days. A number of technical personnel of the Continental refinery were examined by deposition while the run was in progress.

13. During Run No. 10 the charge to the delayed coker comprised a blend of approximately 80% of the content of Tank 68 and about 20% of the Tank 90. These two tanks are large storage tanks normally used by Continental to contain residua fed to its coking operations.

14. Tank 90, during Run No. 10, contained a mixture of "vacuum jug bottoms" and "Duosol extract" (as well as a minor amount of reduced crude) which mixture is typical of the usual coking charge at the Lake Charles refinery during No. 2 or regular coking operations. Tank 68 contained a mixture of "pressure tar" and "syn-tower bottoms" (defined below) primarily the former.

15. The content of Tank 90 was what the SHEA patent calls a "dirty stock" and did not when coked, per se, afford "needle-like coke." The contents of Tank 68 were "clean" as that term is used in the patent and that when coked in the laboratory it would produce low CTE coke which plaintiff calls "needle coke."

16. "Syn-tower bottoms" and "pressure tar" are names applied to cracked

tars produced in the Continental refinery in the catalytic and thermal cracking units, respectively, by processes which were in use for years before SHEA is alleged to have made his invention. The "Syn-tower bottoms" which by some refiners are also called "decanted oil" or "cat. cracker bottoms" were produced by Continental in the conventional manner, viz., distilling a gas oil from crude oil, catalytically cracking the gas oil to produce gas, gasoline, a cracked recycle gas oil and a highly aromatic residue. That residue is what is called the syn-tower bottoms. The "pressure tar" (also called "thermal tar" or "pressure still tar") was produced at Continental's refinery in the conventional manner by taking the cracked recycle gas oil from the catalytic cracking operation and thermally cracking the same along with a number of other distillate materials (the cracked recycle gas oil constituted only about 7% of the thermal cracking feed during Run No. 10) to produce gas, gasoline, cracked recycle gas oil and a high boiling aromatic residue which latter residue is what is called "pressure tar."

17. Neither the "pressure tar" nor the "syn-tower bottoms" in Tank 68 ever contained what the SHEA claims call " * * * components which readily form an insoluble phase upon heating at 350°–550° C." and it follows that such components were, therefore, never removed therefrom.

18. The SHEA patent was granted on an application which, in the patent jargon, is called a "continuation-in-part" application.

19. The SHEA continuation-in-part application was filed on January 25, 1954. It was a continuation-in-part of an earlier SHEA application filed June 15, 1949. One significant difference between the first and second application was the addition in the second of exemplary and descriptive matter directed to (1) the use of delayed coking in the production of "needle coke," (2) pressure tar as a feed stock from which needle coke could be produced and (3) the process of delayed coking pressure tar, no reference to any of which appeared in the first application. A second important difference between the applications lies in the extended editing and deletion of references in the specification of the first application to the use of a "quiescent pool" or to coking under "quiescent conditions." Whereas the specification of the first application had used such expressions repeatedly and explained that what was meant by the same was a coking process in which the residuum was coked in freedom from any significant turbulence or agitation, in the second application all but two references to quiescence or quiescent pool were actually deleted and the descriptive matter was significantly amended in a way which we find was intended among other things to change the meaning of such expressions to include bottom fed delayed coking operations and to make "quiescent pool" as used in the claims mean freedom from any sharp temperature gradient rather than freedom from agitation.

20. Claim 14 of the first SHEA application, as well as later added claims 15 and 16, sought to claim the coking of "syn-tower bottoms" and "pressure tar," as defined above, in a "quiescent pool." These claims made no reference to removing the insoluble components from a residuum, providing simply for producing these cracked tars in the usual way and then coking them in a "quiescent pool." Those claims were repeatedly and, indeed, finally rejected on prior art by the Patent Office. Plaintiff in SHEA's behalf appealed such rejection to the Board of Appeals of the Patent Office and filed a supporting brief. Prior to a hearing before the Board of Appeals, however, plaintiff's attorney interviewed the Examiner in charge of the application on two occasions and agreed to withdraw the Appeal and to cancel claims 14–16 if allowance of certain other claims could be obtained. Such an agreement was reached and claims 14–16 were cancelled from the first application on June 29, 1953. A Notice of Allowance was granted to eight other claims, each of which contained the express, positive

limitation of "removing from a high boiling petroleum residuum those components which readily form an insoluble phase upon heating at 350°–550°C." These eight claims eventually became claims 1–8 of the SHEA patent as noted below.

21. The continuation-in-part was filed on January 25, 1954 containing the previously allowed eight claims as claims 1–8 thereof and additional claims 9–11. The first application was expressly abandoned. Claim 9 of the second application sought to claim the coking of pressure tar without reference to a "removal" step or to a "quiescent pool." Claims 10 and 11 were dependent upon claim 9.

22. Claim 9 was twice rejected by the Patent Office and eventually (along with claims 10 and 11) cancelled from the application. The claims which appear as claims 9–11 of the patent were substituted therefore before allowance was obtained. Each of these claims include the express first step of "removing from a petroleum residuum * * *, etc."

23. The construction of the claim language urged by plaintiff, viz., that the preparation of the catalytic cracking charge, i. e., the distillation of gas oil from the crude oil and the reduced crude, is the claimed removal, and that the "syn-tower bottoms" and "pressure tar" produced by cracking in Tank 68 are the "remaining residuum," is incompatible with the ordinary meaning of the words used in the claim (see page 10 of opinion). We find therefore that plaintiff has failed to establish literal infringement because the accused process does not include the step of "removing from a high boiling petroleum residuum those components which readily form an insoluble phase upon heating at 350°–550°C., and coking the remaining residuum."

24. During Run 10 the crude oil entering the refinery contained dirty componets which prevented the crude, per se, from producing No. 1 coke. When this crude oil was distilled, those components were removed. The syn-tower bottoms and the thermal tar were produced from the clean stream, and the material in the coke drum did not contain enough of the contaminating materials to prevent formation of the needles. It is therefore clear that since the materials going into the coker were derived from the dirty reduced crude oil somewhere between the crude oil still in the coker, the dirty components as defined in SHEA were removed. Because of this and the specification under Claims 2, 10 and 11, we find that the removal step of the accused process functions in substantially the same manner and under the same physical laws to produce the same result as that of the SHEA process. Likewise, the Doctrine of Equivalents applies to the coking steps in the claims. The claims say here that the coking is carried out in a "quiescent pool," or that the material is "coked without agitation, except that incident to the natural movement of the material vapors." The specification explains that this can be done either in "batch coking" or by coking "continuously" in coking drums into which hot residuum is charged.

25. During the prosecution of the SHEA applications a patent to one Voorhees (No. 2,247,535) (assigned to Standard Oil Company) was cited as a ground for rejecting certain claims, including particularly claims 14, 15 and 16 of the original application and claims 9–11 of the second application. The Voorhees patent discloses a process wherein a gas oil distillate to be charged to catalytic cracking is first treated with propane to remove non-paraffinic components. The paraffinic portion is then catalytically cracked and the non-paraffinic portion is thermally cracked. The recycle gas oil from catalytic cracking is sent to thermal cracking and the pressure tar from the thermal cracker is coked. During the prosecution of the second application plaintiff, in order to traverse the Patent Office's rejection of claim 9 (which was directed to the coking of pressure tar) on the Voorhees patent submitted an affidavit by its then vice-president, S. W. Martin. It was averred in the affidavit that the SHEA process was limited to coking 100% "clean"

stock, as that expression is used in the SHEA patent, and that coking of a blend of clean and dirty stocks as disclosed by Voorhees, e. g., including even as little as 10% of the "dirty" normal coker feed, did not yield the desired coke and was, therefore, not the process claimed by SHEA. Such affidavit and the arguments which accompanied the same were effective to persuade the Patent Office to withdraw its rejection on Voorhees. In view of the construction of its claims thus urged upon the Patent Office by plaintiff, we find that the plaintiff cannot now change his earlier position (expressed in the file wrapper) in order to apply the doctrine of equivalents to the accused process which involved coking of a blend of about 80% "clean" and about 20% "dirty" stock.

See detailed discussion heretofore set out.

26. Shea's efforts to get a claim which called categorically for producing pressure tar or syn-tower bottoms in a way refiners have always done so, followed by coking same, was repeatedly rejected. Only when the claims were amended to include the positive removal step were they allowed.

Plaintiff cannot, under the doctrine of equivalents, now urge the patented claims as co-extensive with these claims which were sought and rejected during the prosecution of the patent claim. This is especially true where, as here, the alleged infringement is in an area to which the prior art could possibly have been thought to extend so as to make it impossible to make valid claims for the delayed coking of pressure tar.

27. Plaintiff urges that the accused process infringes the claims of the SHEA patent because it involved, in essence, during Run No. 10, the following two processes:

a. A gas oil charge for catalytic cracking was formed by distillation from crude oil and reduced crude, the gas oil was catalytically cracked to produce gas, gasoline, cracked recycle gas oil, and a high boiling aromatic residue called syn-tower

bottoms which residue was then coked as part of the charge to the delayed coker.

b. A gas oil charge for catalytic cracking was formed by distillation from crude oil and reduced crude; the gas oil was catalytically cracked to produce gas, gasoline, cracked recyle gas oil and a high boiling aromatic residue; the cracked recycle gas oil was fed as part of the charge to the thermal cracking unit wherein the same was cracked to produce gas, gasoline, recycle and a high boiling aromatic residue called pressure tar which was fed as part of the charge to the delayed coker.

28. Defendants have cited numerous patents and publications disclosing the coking of cracked tars, in general, and pressure tar and syn-tower bottoms, in particular, which references were not cited by the Patent Office during the prosecution of the SHEA patent. These deserve careful scrutiny by this Court because the presumption of validity which is accorded a patent over the prior art which the Patent Office did cite is weakened where a pertinent reference was not considered by the Patent Office.

29. These patents have been discussed in detail in the text of this opinion, and for reasons therein set forth we find as a fact that these patents did not anticipate the delayed coking of pressure tar and/or syn-tower bottoms to make premium or needle coke.

30. Defendants have cited the prior use of coking processes conducted by two references as instances of prior "public use" under 35 U.S.Code § 102(b) which invalidate any claim which plaintiff urges be construed to cover the coking of cracked tars such as pressure tar and syn-tower bottoms. Those refineries were operated by Kendall Refining Co. at Bradford, Pa., and Gulf Oil Corp. at Cleves, Ohio. The coke produced by Kendall is admitted by plaintiff to have been needle-like coke.

31. Both Kendall and Gulf have been proven to have coked pressure tar re-

sulting from gas oil cracking many years prior to SHEA's alleged invention. Plaintiff argues that even if this be the case such coking operations are not an invalidating "public use" (in the sense of 35 U.S.Code § 102(b)) of the claimed invention because, it says, the crude oils used in those references were inherently clean stocks which contained no insolubles and could be converted to needle coke without any treatment. This is irrelevant to the issue of whether SHEA is entitled to a valid patent covering the coking of pressure tar resulting from cracking of a gas oil. Kendall and Gulf both produced low CTE coke, which the SHEA patent calls needle coke, by coking pressure tar produced from the thermal cracking of gas oil. Gas oil whether distilled from what plaintiff calls "clean" or "dirty" crudes is "clean" and the tar made from the same is likewise "clean." Whether there were or were not insolubles in a particular crude is irrelevant. Coke, from those refineries was, over a period of many years, the principal source of the premium coke used by both plaintiff and defendant National Carbon in the production of large electrodes. If SHEA is accorded a scope which is to include the accused process, it would also include the coking processes conducted by those refineries many years before SHEA is alleged to have made his invention.

32. Pan-Am Southern Refining Corporation at El Dorado, Arkansas conducted a petroleum coking process involving the coking of pressure tar produced by thermally cracking a feed comprising catalytic recycle gas oil during the period June, 1951 to some time in 1954. That process was conducted by Pan-Am Southern for plaintiff who purchased all of the coke at a price of at least $30 per ton. Eight full-scale coking runs were carred out at Pan-Am prior to January 25, 1953, which date is one year prior to the filing date of the continuation-in-part application in which delayed coking of pressure tar to produce needle coke was first disclosed and claimed. Thousands of tons of needle coke were produced during this period and over $200,000 was paid by Great Lakes to Pan-Am for the coke.

33. However, considering the total circumstances of this Pan-Am operation we find that the operations through January 25, 1953 were substantially for the purposes of experiment. Besides, Great Lakes reserved control over these operations and expected Pan-Am not to divulge the results. The Pan-Am operation did not constitute prior "public use" under 35 U.S.C.A. § 102(b).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter in suit and over the parties involved.

2. A process consisting in the combination of steps individually old is patentable if a new and unexpected result is obtained from the combination. A claim to such combination need not recite structure or acts for carrying out the steps, and is to be construed to cover the structure and acts described in the specification, and equivalents thereof. Williams Mfg. Co. v. United Shoe Mach. Co., 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537; and Title 35 U.S.C.A. § 112.

3. The 1952 Patent Act (35 U.S.C.A. §§ 1 to 293) governs the determination of the issues as to the validity and infringement of the SHEA patent in suit.

4. Under Title 35 U.S.C.A. § 282, the patent in suit is presumed to be valid, and the burden of establishing invalidity rests upon the defendants.

5. There can be infringement under the Doctrine of Equivalents, even though there is no literal reading on the accused process. Graver Tank Company v. Linde Air Production Company, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Hunt Tool Company v. Lawrence, 242 F.2d 347 (5 C.A., 1959).

6. A range of equivalents will not be accorded a claim, under the Doctrine of Equivalents, which would give to that claim the scope of one sought and denied during the prosecution, where the alleged infringement is in an area to which the prior art could possibly have

497

been thought to extend. Smith v. Magic City Kennel Club, Inc., 282 U.S. 784, 789, 51 S.Ct. 291, 75 L.Ed. 707; I. T. S. Rubber Company v. Essex Rubber Co., 272 U.S. 429, 47 S.Ct. 136, 71 L.Ed. 335; International Harvester Co. v. Kellefer Mfg. Co., 67 F.2d 54 (9 C.A., 1933); Hunt Tool Co. v. Lawrence, 242 F.2d 347 (5 C.A., 1957); Air Devices, Inc. v. Factors, Inc., 210 F.2d 481 (10 C.A., 1954).

7. A patent owner is bound by the representations made by the applicant to the Patent Office during the prosecution of the patent as to the nature of his invention and the scope of his claims, where such representations were relied on by the Patent Office in granting the patent; and the patent owner is estopped from asserting a broader or more liberal interpretation of the claims of his patent in an infringement suit than the interpretation which the applicant gave to those same claims during the prosecution of the patent. Plaintiff having successfully persuaded the Patent Office that its claims were not intended to cover the coking of a blend of clean and dirty residua in order to avoid the thrust of the Voorhees patent as an anticipation is estopped from now taking the position that the claims which were allowed are infringed by coking a blend of 80% "clean" pressure tar and 20% "dirty" residua. For this reason, plaintiff is estopped to rely on a construction of SHEA which would cover Continental's use of the 80–20% blended feedstock at Lake Charles.

8. A prior patent, publication or public use is a statutory bar to the validity of a claim under 35 U.S.Code § 102(b) when it has been proven to have existed more than one year prior to the date of the application which first discloses and claims the process of the claim. The process of delayed coking of pressure tar was first disclosed and claimed in the SHEA continuation-in-part application filed January 25, 1954. Prior patents, publications or instances of public use dated earlier than January 25, 1953, therefore, which described or involved

the process, which plaintiff now urges it claims to be construed to cover, would be statutory bars to the validity of such claim.

9. The process carried out at the Pan-Am Southern Refining Co. refinery in El Dorado, Arkansas beginning in June, 1951, in which pressure tar produced by thermal cracking of catalytic cracking recycle gas oil was coked in a delayed coker to produce what plaintiff's records show it regarded as needle coke, was experimental and therefore did not constitute a prior public use under 35 U.S.C.A. § 102(b), and is not a statutory bar to the validity of any claim in the SHEA patent urged as covering such a process.

10. The coking processes carried out by Kendall Refining Company at Bradford, Pennsylvania and by Gulf Oil Corporation at Cleves, Ohio, well more than a year prior to even the first SHEA application (filed in June, 1949) in which pressure tars made by thermally cracking gas oils were coked to produce what the SHEA patent calls needle coke were prior public uses under 35 U.S.C.A. § 102(b) and effective to bar the validity of any claim in the SHEA patent urged as covering the coking of pressure tar.

"TRADE SECRETS"

The opinion and these findings shall constitute the Court's findings and conclusions of law, pursuant to Rule 52(a).

This Court has jurisdiction of the trade secret count by virtue of Section 1338(b) of Title 28, which confers federal jurisdiction over a claim of "unfair competition" when it is joined with a substantial and related claim under the patent laws.

Louisiana follows the law of unfair competition as recognized generally (Guardian Life Insurance Company, 184 F.Supp. 851, E.D.La., 1960). Neither side has relied in their briefs upon any decisions from Louisiana courts and have not alleged that Louisiana law differs in any way from the federal law. Both sides rely solely upon federal precedents so there is no issue here between the

parties as to the applicability of federal law.

■ Plaintiff has the burden of proving each of the several distinct elements necessary to prove a violation of its trade secrets. The Courts in the Fifth Circuit and elsewhere have defined three separate elements that plaintiff must establish in order to prevail on a charge of misappropriation of trade secrets.

■ Judge Cecil, in Kinnear-Weed Corporation v. Humble Oil & Refining Company, 150 F.Supp. 143 (Texas, Beaumont Division, 1956), affirmed 259 F.2d 398, 5 C.A., 1958, listed the essential elements as follows at page 159 of 150 F.Supp.:

"The essential elements of a cause of action for breach of confidence are

"(i) possession by the plaintiff of knowledge or information which is not generally known,

"(ii) communication of this knowledge or information by the plaintiff to the defendant under an express or implied agreement limiting its use or disclosure by the defendant, and

"(iii) use or disclosure by the defendant of the knowledge or information so obtained in violation of the confidence, to the injury of the plaintiff."

The same three elements were listed in the recent decision by Judge McRae in General Steel Products Company v. Lorenz, 204 F.Supp. 518, at page 539, (S.D.Fla., 1962).

■ Despite the fact that pressure tar had been coked by Kendall and Gulf for many years to produce premium coke, no one knew for sure that the making of needle coke was that simple. The prevailing thought was that there was something inherent in the crude oil at Kendall and Gulf that resulted in the production of the premium coke. In 1951, at plaintiff's behest, Pan-Am Southern agreed to a cooperative experimental project with plaintiff for the purpose of determining whether premium coke could be made by coking thermal tar in large quantities. The experiments revealed that large quantities could be so produced—and they were so produced and sold to plaintiff. But, in April of 1953, Pan-Am decided it did not desire to continue with this production. Continental heard of this and became interested. After obtaining permission to do so from plaintiff in April of 1953, Pan-Am permitted Continental to view and study the operation. Then, by the end of 1953, the process was put upon a commercial basis by Continental with an agreement that all of the coke so produced from Continental's Ponca City, Oklahoma plant would be sold to plaintiff. From 1953 to date large quantities of premium coke have been made by Continental from pressure tar at its Ponca City refinery and delivered to plaintiff. On June 17, 1953, Union Carbide made inquiry of Continental about buying some of this Ponca City coke. On July 20, 1953, Continental informed Union Carbide that this coke had been "contracted for five years." Negotiations ensued between Continental and Union Carbide with respect to the building of a coking plant at Continental's refinery at Lake Charles. The Lake Charles plant was to produce premium coke to be sold to Union Carbide. During their negotiations, Continental—wholly unknown to plaintiff—shipped some of the Ponca City premium coke to Union Carbide so that Union Carbide could conduct field and other tests on the same to determine whether it was suitable for making graphite electrodes. In January of 1956, Continental and Union Carbide entered into a firm agreement pursuant to which Continental agreed to manufacture premium coke at Lake Charles and sell it all to Union Carbide. To effectuate this agreement, Continental Oil Company, during 1956 and 1957, proceeded to design and build this coking plant at Lake Charles. In 1958 Continental began manufacturing premium coke there and selling it to Union Carbide. The process

at Ponca City and Lake Charles are the same, except that at Ponca City 100% pressure tar is used, whereas in Lake Charles a blend is used.

In 1954 and 1955 there was very close cooperation between Continental and Union Carbide, and several carloads of premium coke were shipped and sent to Union Carbide from the Ponca City plant. Samples of the thermal tar were also sent. The purpose was to enable Union Carbide to find out whether this coke was suitable for their purposes. In July of 1957 Continental made a special run of about 400 tons of premium coke at Ponca City, using a feed stock of less than 100% thermal tar. This special run was not revealed to Great Lakes. From this run, about 100 tons of premium coke were sent, free of charge, to Union Carbide, so that a determination could be made as to whether it was suitable for use in making graphite electrodes. It can hardly be doubted that these instances of shipping coke to Union Carbide constituted a breach of its contract with Great Lakes. But this is *not* a suit for breach of contract. The tort complained of here is the alleged conspiracy beginning in 1953 which allegedly destroyed plaintiff's rights in certain trade secrets. The remedy sought *in effect* would be an injunction removing Union Carbide as a competitor in the graphite electrode field.

What are these trade secrets? Plaintiff has specifically identified them as:

"An application for patent was filed on this process on June 15, 1949. The process described in this Shea application and in the 'Continuation-in-Part' Application filed in 1954, and in the File Wrappers thereof constitutes the trade secrets which are the subject matter in this cause."

Neither of the defendants saw or were informed of the contents of the SHEA patent and its file wrapper until after the patent issued. At the time of the beginning of the alleged conspiracy in 1953, the only patent application of plaintiff before the Patent Office was Shea Application Serial No. 99,344, filed June 15, 1949. The Shea Second, or continuation-in-part application, Serial No. 405,979, filed in the Patent Office on January 25, 1954, contained for the first time the disclosure of the delayed coking of pressure tar. This application discloses only in general terms the delayed coking of pressure tar. It does not disclose operating instructions as to how the delayed coking process should be carried out to produce needle coke. On rebuttal, a witness for plaintiff describes three operating conditions for the SHEA delayed coking process which he testified are "critical to the manufacture of needle coke" (Tr. 3670). He described these critical conditions as compared with regular coking operations as:

1. a lower rate of feed of pressure tar (Tr. 3667),

2. a higher coker recycle ratio (Tr. 3671), and

3. a higher transfer line temperature (to the delayed coker) (Tr. 3670–71).

Counsel for plaintiff asserted during argument that these three conditions were a part of plaintiff's trade secret case. We do not think that these so-called "critical conditions" were really critical at all. The witness conceded (Tr. 3790) that his first two "critical conditions" were necessary only in order to make the heavy oil less viscous so that it might be pumped through the pipes and coils of the equipment. Pressure tar is, of course, heavier than the feed stock used in regular coking runs so that reducing the feed rate somewhat and increasing the recycle ratio (to dilute the incoming pressure tar with lighter materials) was a matter of common sense. The third so-called "critical condition"— that is, the higher transfer line temperature—was limited to the particular unit that Continental operated at Ponca City in 1953. The temperature in the accused process at Lake Charles is lower than the regular coking operation (Tr. 3787).

It is our opinion that the identity of plaintiff's alleged trade secret must be the simple fact that No. 1 (premium) (needle) coke could be made in large

quantities by coking pressure tar in a delayed coker. This is precisely what Mr. Roy Diwoky, Executive Vice-President of Pan-Am, told Mr. D. R. Johnson of Continental on March 12, 1953.

We find *additional* facts as follows:

1. Plaintiff's alleged trade secrets are to be found described in the SHEA patent and its Patent Office file wrapper.

2. Neither of the defendants saw or were informed of the contents of the SHEA patent and its file wrapper until after the patent issued. At the time of the first alleged conveyance of plaintiff's trade secrets to defendants in 1953 the only patent application of plaintiff before the Patent Office was Shea Application Serial No. 99,344 filed June 15, 1949. That application contains no disclosure whatever of either pressure tar or delayed coking.

3. The Shea second or continuation-in-part application, Serial No. 405,979 filed in the Patent Office on January 25, 1954 did contain disclosure of the delayed coking of pressure tar.

4. The second Shea application discloses only in general terms the delayed coking of pressure tar. It does not disclose operating conditions or give any instructions as to how the delayed coking process should be carried out to produce needle coke.

5. On March 12, 1953 during the course of a business conference on other matters, Mr. Roy Diwoky, Executive Vice-President of Pan-Am Southern, informed Mr. D. R. Johnson, General Manager of Manufacturing for Continental Oil, that (1) Pan-Am Southern had been coking pressure tar in its delayed coker at El Dorado, Arkansas for Great Lakes, (2) it wanted to quit the operation, and (3) if Continental had any interest in carrying out such an operation it should contact plaintiff's Vice-President, Mr. John Dowdle.

6. On April 6, 1953 three Continental Oil engineers, Messrs. Cameron, Guest, West, visited Pan-Am Southern Refinery in El Dorado at the invitation of Mr. Diwoky. They were afforded an opportunity to inspect the delayed coker, were given certain operating data relative to the Pan-Am coker during both regular and pressure tar coking operations and were informed that Pan-Am had coked pressure tar in the unit on a number of occasions. None of this operating data is specified in either the SHEA patent applications or the SHEA patent.

7. The Continental engineers also visited a number of other refineries of competitive oil companies in the weeks immediately preceding the El Dorado visit because Continental was planning to replace its old delayed coker with a new one and desired information on recently constructed units. The Pan-Am coker at El Dorado was one of the newest units.

8. Plaintiff has failed to identify what specific information described in the SHEA patent and/or its file wrapper was the secret allegedly misappropriated by defendants in 1953. The only information relevant to the issues herein which the alleged secret could be is the broad concept of delayed coking of pressure tar to make premium coke in large quantities.

9. Several months prior to the first communication between either plaintiff or Pan-Am Southern and defendant Continental Oil relative to delayed coking of pressure tar, Continental had itself considered the economic feasibility of coking pressure tar in its delayed coker located at Ponca City.

10. Before the alleged invention of the SHEA patent, defendant Union Carbide's National Carbon division:

a. knew that coke then being manufactured and sold by Kendall Refining Company, Bradford, Pa., was superior to other cokes for making graphite electrodes, and had, indeed, consistently purchased the majority of such coke,

b. learned from its research work that Kendall coke had an unusually low coefficient of thermal expansion (CTE) and that this

coefficient was a most significant measure of coke quality,

c. found from its research work that certain petroleum cokes, cf. those made by Standard of Ohio at Lima, Ohio and by Kendall Refining Company at Bradford, Pa., had "needle-like splintery" structure,

d. learned in the course of its laboratory work that graphitized coke having a very low coefficient of thermal expansion (CTE) resulted from coking a high boiling distillate from coal tar,

e. discovered that aromatic type coking feedstocks produced superior coke for electrode use and and that certain petroleum as well as coal tar materials were aromatic in nature and thus useful for this purpose,

f. obtained samples of the pressure tar being coked by Gulf Oil Company at Cleves, Ohio, in 1943 and had determined that it was No. 1 grade coke which had very low CTE equal to Kendall coke, and

g. determined that pressure tar was the optimum coker charge for the production of No. 1 coke for use in graphite electrodes.

11. During the period from 1945 to about 1953 National Carbon expected to obtain a captive or "in-house" supply of premium coke (to be made from hydrogenated coal, aromatic in nature) from its sister division within Union Carbide, the Carbide and Carbon Chemicals division. During this period the supply of Kendall and Gulf petroleum coke gradually diminished (Gulf in essence ceased production in 1949).

12. In late 1952 or early 1953 National Carbon decided it could wait no longer for the hydrogenated coal process to be commercialized, as promised, by its sister division and embarked on an exhaustive survey of the petroleum field in search for an oil refinery having feedstocks of the type it knew would give No. 1 coke and who would be willing to coke the same on a plant scale.

13. National Carbon selected two men, J. deRaismes, a purchasing agent, and L. C. Werking, an engineer, in January, 1953 to make a survey in the refinery field. Following their study of the prior National Carbon research work which had, among other things, determined pressure tar to be an optimum feedstock for production of No. 1 coke Messrs. deRaismes and Werking visited various refineries and requested samples of the highly aromatic cracked residua from catalytic and thermal cracking operations, i. e. syntower bottoms (cat. cracker bottoms) and pressure tar, respectively. Upon obtaining samples of such cracked tars from the refineries, the same were coked in the National Carbon laboratory. The excellence of coke made from such tars was confirmed in the laboratory almost immediately. Werking and deRaismes then sought to persuade various refiners to charge such stocks to their delayed cokers on a commercial basis.

14. The first refinery that National Carbon's two man team of deRaismes and Werking visited was that of Standard Oil Company of Ohio (Sohio) located at Lima, Ohio, on April 29, 1953. At that time Werking inquired of Mr. R. Boyink, who was responsible for Sohio's coke sales, whether Sohio had any catalytically cracked bottoms (Also known as syntower bottoms and decanted oil) available for coking. Boyink affirmed that it did and agreed to look into the possibility of coking the same. Werking at that time obtained samples of the catalytically cracked bottoms then being produced by Sohio's refinery and forwarded them to the National Carbon research laboratory where they were coked sometime prior to July 15, 1953 (DX–278) to make No. 1 coke.

15. On September 2, 1953 Werking advised Sohio of the National Carbon laboratory results and that National Carbon wanted to purchase commercial quantities of coke made by delayed coking of

Sohio's catalytically cracked bottoms. Thereafter, on October 1, 1953, Sohio and National Carbon entered into a contract (National Carbon No. PC–262352) for production and sale of 150 to 300 tons of coke made from catalytically cracked bottoms. Coke was made by Sohio pursuant to that contract in December of 1953 and was sold and delivered to National Carbon.

16. Sohio also coked commercial quantities of catalytically cracked bottoms (decanted oil) in a delayed coker in April of 1951, and again in February and April of 1953 as well as December of that year. Those coking runs were fully documented at the trial. The coke from those runs was sold by Sohio in the normal course of business.

17. There was nothing secret about any of the Sohio coking runs in 1951 and 1953 in which commercial quantities of catalytically cracked bottoms were fed to a delayed coker.

18. In June of 1953, as part of Werking's program and well before any contact between Union Carbide and Continental Oil concerning coking of pressure tar, Werking forwarded a sample of pressure tar to the M. W. Kellogg Company, an engineering company, in order that Kellogg might determine the maximum coke yield in a delayed coker. Kellogg made the requested determination and rendered to National Carbon a written proposal dated September 23, 1953 (DX–435) in which the estimated costs of building and operating a delayed coker were set forth.

19. Before any contact whatever between Union Carbide and Continental Oil concerning the coking of pressure tar, i. d. before October 14, 1953, Union Carbide had also obtained samples of pressure tar and other cracked tars from various oil companies, including Sohio, Imperial, Cities Service and Gulf, and had coked these residua in the laboratory and established that the same made No. 1 coke.

20. On October 14, 1953 deRaismes and Werking visited Continental Oil at Ponca City, Oklahoma in the course of their continuing refinery survey. This was the first contact between the two companies concerning production of No. 1 coke generally, or coking of cracked aromatic tars in particular. On that date deRaismes and Werking called upon Mr. Harold Osborn, Continental's then Vice-President in charge of production. The National Carbon representatives told Mr. Osborn they were interested in coke made from highly aromatic materials such as decanted oil and asked whether Continental had such materials available. Mr. Osborn advised them that Continental had made two coking runs on such a material earlier that year and that Continental had a contract to sell all coke made in that refinery to another company. Mr. Werking reported to his management at National Carbon that this information confirmed National Carbon's prior conclusions "that cat bottoms (decant oil) make good charging stock for coke production" (DX–289). National Carbon learned little concerning production of No. 1 coke from Continental Oil that it did not already know, except that Continental could do the job first class and had both the know-how and the equipment.

21. Plaintiff has failed to prove an essential element of a cause of action for misappropriation of trade secrets (possession by the plaintiff of knowledge or information which was not known to defendants).

22. The pressure tar coking runs were commenced by Pan-Am Southern in June of 1951 and were carried out pursuant to a letter of agreement with Great Lakes (DX–62) which contains no suggestion of the existence of any secrecy or confidence between the parties. Plaintiff did not at any time expressly require Pan-Am Southern to maintain any bond of secrecy concerning those coking runs, and Pan-Am Southern did not acquiesce in any such relationship. Those coking runs continued on a regular basis from 1951 through 1953 and during part of 1954.

23. On March 12, 1953, when Mr. Roy Diwoky of Pan-Am Southern informed Mr. D. R. Johnson of Continental Oil that Pan-Am had been coking pressure tar in its delayed coker for Great Lakes, the information so disclosed by Diwoky was volunteered to Continental Oil in the hope that Continental could be persuaded to take over the project and thus relieve Pan-Am of an operation it no longer wanted to continue.

24. During Mr. Diwoky's discussion with Mr. Johnson on March 12, 1953 Diwoky suggested that if Continental were interested in coking pressure tar in its delayed coker, that Johnson call plaintiff's Vice-President, John Dowdle. Pursuant to Diwoky's suggestion, Johnson telephoned Dowdle shortly thereafter and was informed that plaintiff would like to have Continental Oil coke pressure tar for it. Johnson then contacted Diwoky again and reported the results of his conversation with Dowdle. Arrangements were made by telephone for Continental to send engineers to Pan-Am's refinery at El Dorado to view the coking operation.

25. The tenor of the contacts between Diwoky, Johnson and Dowdle in the Spring of 1953 was one in which (a) Diwoky was happy to have found someone to coke pressure tar rather than Pan-Am; (b) Continental was interested in making and selling coke; (c) plaintiff was happy to have located someone else who would make the premium coke for them, and that while there was no express agreement of secrecy, there was an implied confidential relationship existing between Continental and the plaintiff.

26. It is true that there was no written agreement of secrecy. It is true that there was no express oral agreement of secrecy. It is true that Continental was not expressly told that the coking operation was secret, but we feel that there was a confidential relationship and that by assuring McConnell in Mid-1955 that no information or experience on making special coke would be taken to Lake Charles from Ponca City that Johnson admitted that there was something confidential as between Continental and plaintiff concerning the Ponca City operation.

27. As stated in Finding No. 26, we do feel that there was an implied confidential relationship between Continental and Great Lakes, and that Continental was under an obligation not to give away any trade secrets that it had acquired by joint experiment with Great Lakes.

28. Before contacting Continental in October of 1953 Union Carbide had knowledge of pressure tar coking as part of its accumulation of technical knowledge over years of National Carbon research.

29. Plaintiff did not advise defendants or either of them that it thought it possessed trade secrets or that it thought its alleged secrets had been misappropriated until about June of 1957, which was about six months after the SHEA patent had issued and approximately four years after the time of the alleged misappropriation.

30. Plaintiff knew that Continental proposed to make No. 1 coke for National Carbon at Lake Charles at least as early as the summer of 1955, which was before construction of the Lake Charles plant had begun. In spite of this knowledge plaintiff remained silent about its alleged trade secrets until Continental's plant costing several millions of dollars had almost been completed.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the second or so-called trade secrets count of the complaint by reason of Title 28 U.S.Code § 1338(b).

2. The applicable law as to plaintiff's second cause of action is that of the United States generally and is not limited to the law of the State of Louisiana (Guardian Life Insurance Co. v. Guardian Insurance Co., 184 F.Supp. 851, E.D. La., 1960; Pursche v. Atlas Scraper & Engineering Co., 300 F.2d 467, 9 C.A., 1961).

3. Any alleged secret contained in a patent application pending before

the U. S. Patent Office, or in its Patent Office file, becomes available to the public and therefore a matter of public knowledge on the day that the patent is issued by the Patent Office (Picard v. United Aircraft Corp., 128 F.2d 632, 2 C.A., 1942; Kohloff v. Ford Motor Co., 37 F. Supp. 470, S.D.N.Y., 1940).

4. Plaintiff has no cause of action for violation of trade secrets because its alleged trade secret (the delayed coking of pressure tar to make needle coke) was known by Union Carbide before any contact with Continental in regard thereto. (Kinnear-Weed Corporation v. Humble Oil Company, D.C., 150 F.Supp. 143; General Steel Products Co. v. Lorenz, D.C., 204 F.Supp. 518.

5. Proof of the existence of a trade secret is *sine qua non* to plaintiff's claim of misappropriation of trade secrets. Plaintiff has failed to identify any information alleged to be secret which was appropriated by defendants.

6. Where an alleged trade secret was known to the recipient prior to its disclosure to him the recipient is free to use it (Larson v. General Motors Corp., 2 F.R.D. 294, S.D.N.Y., 1941; De Filippis v. Chrysler Corp., 159 F.2d 478, 2 C. A., 1947). In this case the information alleged by plaintiff to constitute its trade secrets had been independently developed by Union Carbide in its own research laboratories and thus was well known to it prior to any communication from either plaintiff or defendant Continental Oil.

## CONCLUSION

SHEA is not infringed, but if construed to cover the delayed coking of pressure tar it is invalid.

The trade secret count fails because plaintiff has not identified any information alleged to be secret which was appropriated by defendants. The delayed coking of pressure tar to make premium coke had been independently developed by Union Carbide in its own research laboratories and thus was well known to it prior to any communication with Continental.

This is not a suit for breach of contract and the issue of whether or not Continental breached its contract with Great Lakes is not before us. Neither is the issue of whether or not Union Carbide enticed Continental to breach. A major reason for the trade secret count as stated by counsel was: "It relates to the nature of the injunction we are seeking. If we win on the patent suit, we have a monopoly. Our patent issued in 1956, we have a monopoly for only 17 years. If we win on the trade secrets, both of these defendants should be enjoined permanently, not only for 17 years but for all times." (Final Argument, page 150).

The case is dismissed. This is a final judgment. No further order is necessary.